1  Robert C. Moest, Of Counsel, SBN 62166
2  **THE BROWN LAW FIRM, P.C.**
3  2530 Wilshire Boulevard, Second Floor
   Santa Monica, CA 90403
4  Telephone: (310) 915-6628
   Facsimile: (310) 915-9897
5  Email: RMoest@aol.com

6  *Counsel for Plaintiff*

7
8  [Additional Counsel on Signature Page]

9              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
10

11  EDUARDO PRECIADO, derivatively on
    behalf of GITLAB INC.,
12
                                                    Case No.:
13              Plaintiff,

14      v.

15                                          **DEMAND FOR JURY TRIAL**
16  SYTSE SIJBRANDIJ, BRIAN G.
    ROBINS, DAVID DESANTO,
17  SUNDEEP BEDI, KAREN BLASING,
    SUE BOSTROM, MATTHEW
18  JACOBSON, MARK PORTER,
    MERLINE SAINTIL, and GODFREY        **VERIFIED SHAREHOLDER**
19  SULLIVAN,                            **DERIVATIVE COMPLAINT**
20
21              Defendants,

22      and
23
    GITLAB INC.,
24
25              Nominal Defendant.

26
27                     **INTRODUCTION**
28

Plaintiff Eduardo Preciado ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant GitLab Inc. ("GitLab" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Sytse Sijbrandij ("Sijbrandij"), Brian G. Robins ("Robins") David DeSanto ("DeSanto"), Sundeep Bedi ("Bedi"), Karen Blasing ("Blasing"), Sue Bostrom ("Bostrom"), Matthew Jacobson ("Jacobson"), Mark Porter ("Porter"), Merline Saintil ("Saintil"), and Godfrey Sullivan ("Sullivan") (collectively, the "Individual Defendants," and together with GitLab, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of GitLab, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Sijbrandij, Robins, and DeSanto for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GitLab, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from June 5, 2023 through June 3, 2024, inclusive (the "Relevant Period").

2. GitLab was first founded in 2011 as an open-source project before being launched as an open-core business model in 2014. The Company operates entirely remotely, with its employees located all over the world. Originally a web-based Git repository, a virtual space that stores projects' codes and version histories, GitLab has morphed into a single platform solution that envelopes the entirety of software during its development life, from the planning stage all the way to production and security.

3. As the Company began to evolve, it began to experiment with artificial intelligence ("AI") features in its platform. Throughout the Relevant Period, the Individual Defendants began to push the Company's new AI features, namely how it drove market demand, expanded monetization opportunities through its paid add-on feature, GitLab Duo, and supported a 54% increase in the price of the Company's Premium tier, its otherwise most utilized offering.

4. During the Relevant Period, the Individual Defendants issued or caused the Company to issue false and misleading statements that made it appear to investors that customers had accepted the new pricing model and AI integration of the Company's platform, including positive testimonials and promoting the Company's renewal and churn rates. This, however, was far from the truth, as the demand for the Company's Ai product was impacted by, *inter alia*, concerns from potential customers about security and data privacy, the Company's AI not featuring the capabilities advertised, delayed deployment, and largely negative customer feedback.

5. Despite this, the Individual Defendants continued to spread misinformation about the Company's product. For example, on June 5, 2023, the Company issued a press release announcing the Company's financial results for the first quarter of the 2024 Fiscal Year[1] (the "Q1 2024 Earnings Release"). The Q1 2024 Earnings Release included a

---

[1] GitLab's fiscal year does not mirror the calendar year, but instead starts on February 1 and ending on January 31 each year.
For the period between February 1, 2023 and January 31, 2024, the "2024 Fiscal Year."
For the period between February 1, 2024 and January 31, 2025, the "2025 Fiscal Year."

"Business Highlights" section which detailed that the Company recently "[a]nnounced AI-powered workflows in a single DevSecOps platform with the introduction of Code Suggestions, AI-assisted vulnerability guidance, and Value Streams Dashboards to improve developer productivity across."

6.     In addition, the Q1 2024 Earnings Release quoted Defendant Sijbrandij, who highlighted the Company's AI capabilities, stating that "With AI revolutionizing how companies develop, secure, and operate software, we believe GitLab is positioned as the leading AI-powered DevSecOps platform[.] … Today, we deliver more AI-powered capabilities to customers than any other DevSecOps platform." The Q1 2024 Earnings Release also quoted Defendant Robins, who also highlighted the Company's AI capabilities, stating that "Against a backdrop of macroeconomic uncertainty, customers are looking to our AI-powered DevSecOps platform to drive efficiencies, increase productivity, and accelerate their pace of innovation. We are poised to make the most of the estimated \$40B total addressable market opportunity before us."

7.     The truth did not emerge until June 3, 2024 when, after the market closed, the Company issued a press release announcing its financial and operational results for the first quarter of the 2025 Fiscal Year (the "Q1 2025 Earnings Release"). The Q1 2025 Earnings Release revealed that the Company had completed a standalone selling price ("SSP") analysis that estimated the Company had an estimated \$4 million headwind to its FY 2025 revenue guidance relative to the Company's initial guidance as had been delivered on March 4, 2024. The Q1 2025 Earnings Release also announced that in the first quarter, the Company's Annual Recurring Revenue ("ARR") increased approximately 21% year-over-year, 5 points below expectations and significantly less than the 37% year-over-year growth of the prior quarter. Lastly, the Company's Dollar-Based Net Retention Rate ("DBNRR") decreased by 1 point to 129%.

8.     On this news, the price of the Company's stock fell $2.32 per share, or approximately 4.9%, from a close of $47.07 per share on June 3, 2024, to close at $44.75 per share on June 4, 2024.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's AI capabilities did not reach much of what was advertised; (2) upon announcement, the AI feature were not made as widely available as advertised; (3) the Company's demand for AI integration was lower than expressed due to security and data privacy concerns; (4) the Company's customer feedback on its AI capabilities was largely negative; (5) AI integration into the Company's platform was not viewed as adding value; (6) the Company was experiencing slowed net seat expansion due to the increase in the Premium tier price; and (7) as a result of all of this, the Company experienced a decline in expansion growth in its Premium tier, which led to a reduction in the Company's revenue guidance for the 2025 Fiscal Year. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.     Moreover, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $223.4 million.

11.     In light of the Individual Defendants' misconduct—which has subjected the Company, its co-Founder, Board Chairman, and former Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chief Product Officer ("CPO") to a federal securities fraud class action lawsuit pending in the United States District Court for the

Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Sijbrandij's, Defendant Robins's, and Defendant DeSanto's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.    This derivative action is not a collusive action to confer jurisdiction on a court

of the United States that it would not otherwise have.

17.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

18.    Plaintiff is a current shareholder of GitLab. Plaintiff has continuously held GitLab common stock at all relevant times.

### Nominal Defendant GitLab

19.    GitLab is a Delaware corporation. GitLab is a fully remote company with no corporate headquarters. GitLab's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "GTLB."

### Defendant Sijbrandij

20.    Defendant Sijbrandij co-founded the Company in 2011 and served as its CEO from September 2014 until December 2024. He has also served as the Chairman of the Company's Board since September 2014. According to the Schedule 14A the Company filed with the SEC on April 30, 2024 (the "2024 Proxy Statement"), as of March 31, 2024, Defendant Sijbrandij owned 19,43,559 shares of GitLab's Class B stock, representing 45.51% of Company shareholder voting power and thereby making him a controlling shareholder.

21.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Sijbrandij made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| July 17, 2023 | 230,000 | $52.61 | $12,100,990 |
| September 15, 2023 | 155,000 | $48.71 | $7,550,050 |

| | | | |
|---|---|---|---|
| November 15, 2023 | 159,433 | $49.38 | $7,872,801 |
| December 15, 2023 | 1,425,567 | $63.00 | $89,810,721 |
| January 16, 2024 | 380,000 | $62.29 | $23,164,460 |
| February 14, 2024 | 380,000 | $74.12 | $28,164,460 |
| March 15, 2024 | 230,000 | $53.89 | $12,394,700 |
| March 18, 2024 | 75,000 | $55.19 | $4,139,250 |
| April 15, 2024 | 56,000 | $55.65 | $3,116,400 |
| May 15, 2024 | 56,000 | $55.98 | $3,135,048 |

Thus, in total, before the fraud was exposed, Defendant Sijbrandij sold 3,147,000 shares of Company stock on inside information, for which he received approximately $191.4 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

22.    The 2024 Proxy Statement stated the following about Defendant Sijbrandij:

*Sytse Sijbrandij* is our co-founder and has served as our Chief Executive Officer and a member of our board of directors since September 2014, and as Chair of our board of directors since March 2021. From January 2008 to August 2012, Mr. Sijbrandij served as a founder at Comcoaster, a software company. From August 2009 to January 2012, Mr. Sijbrandij also served as a part-time Software Architect at Ministerie van Justitie, the Dutch Ministry of Safety & Justice. From November 2003 to December 2007, Mr. Sijbrandij was the Operational Director at U-Boat Worx B.V., a recreational submersible company. Mr. Sijbrandij earned a B.S. and M.Sc. from the University of Twente in Management Science. We believe Mr. Sijbrandij is qualified to serve as a member of our board of directors because of the historical knowledge, operational expertise, leadership, and continuity that he brings to our board of directors as our co- founder and Chief Executive Officer.

**Defendant Robins**

23.    Defendant Robins served as the Company's CFO since October 2020.

24.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Robins made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| June 12, 2023 | 30,000 | $48.37 | $1,451,100 |
| July 10, 2023 | 10,000 | $49.84 | $498,370 |
| September 12, 2023 | 10,000 | $52.86 | $528,600 |
| October 11, 2023 | 10,000 | $48.20 | $482,000 |
| November 13, 2023 | 10,000 | $45.49 | $454,900 |
| December 11, 2023 | 37,498 | $59.70 | $2,238,630 |
| December 12, 2023 | 2,502 | $60.00 | $150,120 |
| January 9, 2024 | 13,000 | $61.02 | $793,299 |
| January 22, 2024 | 75,000 | $70.94 | $5,320,500 |
| April 1, 2024 | 60,000 | $56.95 | $3,417,180 |
| May 1, 2024 | 30,000 | $53.41 | $1,602,390 |

Thus, in total, before the fraud was exposed, Defendant Robins sold 288,000 shares of Company stock on inside information, for which he received approximately $16.9 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.     The 2024 Proxy Statement stated the following about Defendant Robins:
*Brian Robins* has served as our Chief Financial Officer since October 2020. Since April 2019, Mr. Robins has also served as a Special Advisor at Brighton Park Capital, L.P., an investment firm that specializes in software, information services and technology-enabled services. Prior to joining us, from October 2019 to October 2020, Mr. Robins served as Chief Financial Officer at Sisense Ltd., a business intelligence software company, and from August 2017 to April 2019, he served as Chief Financial Officer and Treasurer of Cylance Inc., a cybersecurity software company. Mr. Robins also served as Chief

Financial Officer of AlienVault, Inc. a unified security management software company, from June 2015 to August 2017. From October 2012 to March 2014, he served as the Vice President and Chief Financial Officer of Global Business Services at Computer Sciences Corporation, a global information technology company. From February 2007 to October 2011, he held several senior positions at VeriSign, Inc., including Chief Financial Officer from August 2009 to October 2011 and Acting Chief Financial Officer from April 2008 to August 2009. Mr. Robins earned a B.S. in Finance from Lipscomb University and an M.B.A from Vanderbilt University.

**Defendant DeSanto**

26. Defendant DeSanto has served as the Company's CPO since December 2022. He's also held other roles at the Company prior to his appointment as CPO, most recently as the Vice President, Product from January 2022 until December 2022.

27. The "Leadership" page of the Company's website[2] states the following about Defendant DeSanto:

David DeSanto is the Chief Product Officer at GitLab Inc., where he leads GitLab's product division to define and execute GitLab's product vision and roadmap. David is responsible for ensuring the company builds, ships, and supports the platform that reinforces GitLab's leadership in the DevSecOps platform market.

David joined GitLab in 2019 to expand GitLab's Ultimate tier and build security into the GitLab DevOps platform. He was promoted to chief product officer in 2022. Prior to GitLab, David has held product and engineering leadership roles at Spirent Communications, NSS Labs and ICSA Labs.

David holds an M.S. in Cybersecurity from New York University and a B.S. in Computer Science from Millersville University of Pennsylvania. He is a frequent speaker at major international conferences on topics including AI, DevSecOps, platform engineering, threat intelligence, and cloud security, in addition to being the co-author of Threat Forecasting.

**Defendant Bedi**

28. Defendant Bedi has served as a Company director since April 2019. He also serves as a member of the Audit Committee.

---

[2] https://about.gitlab.com/company/team/e-group/

Verified Shareholder Derivative Complaint

29.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bedi made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| March 27, 2024 | 9,000 | $58.64 | $527,760 |

Thus, in total, before the fraud was exposed, Defendant Bedi sold 9,000 shares of Company stock on inside information, for which he received approximately $527,760 in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

30.    The 2024 Proxy Statement stated the following about Defendant Bedi:

*Sundeep Bedi* has served as a member of our board of directors since August 2021. Mr. Bedi has served as Chief Information Officer and Chief Development Officer of Snowflake Inc. since January 2020. Previously, Mr. Bedi served in positions of increasing responsibility at Nvidia Corp. from February 2008 through January 2020, most recently as Vice President of Global IT. Mr. Bedi earned a B.S. in Biology from the University of San Francisco and an M.B.A. from the University of San Francisco. We believe Mr. Bedi is qualified to serve as a member of our board of directors because of his technical expertise and leadership experience in the technology industry.

**Defendant Blasing**

31.    Defendant Blasing has served as a Company director since August 2019. She also serves as the Chair of the Audit Committee.

32.    The 2024 Proxy Statement stated the following about Defendant Blasing:

*Karen Blasing* has served as a member of our board of directors since August 2019. Ms. Blasing served as Chief Financial Officer of Guidewire Software, Inc., a back-end systems software company, from July 2009 to March 2015. Ms. Blasing has served as a member of the board of directors of AutoDesk, Inc., a 3D design software company, since March 2018, and Zscaler, Inc., a cloud-based information security company, since January 2017. Ms. Blasing also served as a member of the board of directors of Ellie Mae, Inc. from June

2015 to April 2019. Ms. Blasing earned a B.A. in Economics and Business Administration from the University of Montana and an M.B.A. from the University of Washington. We believe that Ms. Blasing is qualified to serve as a member of our board of directors because of her executive leadership experience, extensive experience in the technology field, extensive finance experience, and her experience as a director of public companies.

**Defendant Bostrom**

33.    Defendant Bostrom has served as a Company director since April 2019. She also serves as the Chair of the Compensation and Leadership Development Committee ("Compensation Committee") and a member of the Nominating and Corporate Governance Committee.

34.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bostrom made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| September 8, 2023 | 20,000 | $52.76 | $1,055,200 |
| September 11, 2023 | 15,000 | $53.00 | $795,000 |
| September 12, 2023 | 15,000 | $53.15 | $797,250 |
| September 13, 2023 | 15,000 | $51.00 | $765,000 |
| December 12, 2023 | 40,000 | $60.87 | $2,434,800 |

Thus, in total, before the fraud was exposed, Defendant Bostrom sold 105,000 shares of Company stock on inside information, for which she received approximately $5.8 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

35.    The 2024 Proxy Statement stated the following about Bostrom:

*Sue Bostrom* has served as a member of our board of directors since April

2019. Ms. Bostrom served as Executive Vice President and Chief Marketing Officer at Cisco Systems, Inc., a technology services and products company, where she was an executive from 1997 to 2011. Ms. Bostrom has served as a member of the board of directors of SingleStore, a software as a service company, since October 2022, Samsara, a cloud operations platform company, since March 2021, Outreach, a sales engagement platform company, since March 2020, and ServiceNow, Inc., a cloud-based solutions software company, since July 2014. Ms. Bostrom served as a member of the board of directors of Anaplan, Inc., a business planning software platform company, from September 2017 to June 2022, Nutanix, Inc. a virtualized datacenter platform company, from October 2017 to March 2022, Cadence Design Systems, a computational software company, from February 2011 to May 2021, and Varian Medical Systems, a radiation oncology treatments and software company, from February 2005 to February 2019. Ms. Bostrom earned a B.S. in Business from the University of Illinois and an M.B.A. from Stanford University. We believe that Ms. Bostrom is qualified to serve as a member of our board of directors because of her executive leadership experience, compensation committee experience, and experience as a director of public companies.

### Defendant Jacobson

36.    Defendant Jacobson has served as a Company director since April 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

37.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Jacobson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| September 13, 2023 | 81,876 | $51.31 | $4,200,975 |
| September 20, 2023 | 89,177 | $48.37 | $4,313,134 |

Thus, in total, before the fraud was exposed, Defendant Jacobson sold 171,053 shares of Company stock on inside information, for which he received approximately $8.5 million in total proceeds. His insider sales, made with knowledge of material nonpublic

information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

38.     The 2024 Proxy Statement stated the following about Defendant Jacobson:

*Matthew Jacobson* has served as a member of our board of directors since August 2018. Mr. Jacobson has served as a Partner at ICONIQ Capital and General Partner at ICONIQ Growth, an investment and venture capital firm where he has worked since September 2013. Mr. Jacobson serves on the board of directors of Datadog, Inc., a monitoring and data analytics company since July 2019, and served on the board of directors of Braze, Inc. a customer engagement platform company, from July 2017 to April 2023, and Sprinklr, Inc., an enterprise software company, from December 2014 to December 2022. Additionally, Mr. Jacobson serves as chairman of the board of directors for Collibra NV and currently serves on the boards of a number of private technology companies, including BambooHR LLC, Orca Security Ltd., RealtimeBoard Inc. dba Miro, and Relativity ODA LLC. Mr. Jacobson previously served on the board of directors of Twistlock Inc. from July 2018 to July 2019 and as a shareholder representative for Adyen NV from September 2015 to June 2018. Prior to ICONIQ Capital, Mr. Jacobson held operating roles at Groupon and investing roles at Battery Ventures and Technology Crossover Ventures. He began his career as an investment banker at Lehman Brothers. Mr. Jacobson earned a B.S. in Finance and Management from The Wharton School of the University of Pennsylvania. We believe that Mr. Jacobson is qualified to serve as a member of our board of directors because of his executive leadership experience and extensive experience with the venture capital and technology industries.

**Defendant Porter**

39.     Defendant Porter served as a Company director from December 2022 until April 2024. In that time, he also served as a member of the Audit Committee.

40.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Porter made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| December 15, 2023 | 746 | $64.00 | $47,744 |

| December 18, 2023 | 625 | $62.41 | $39,006 |
|---|---|---|---|

Thus, in total, before the fraud was exposed, Defendant Porter sold 1,371 shares of Company stock on inside information, for which he received approximately $86,750 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

41.     The Schedule 14A the Company filed with the SEC on May 15, 2023 (the "2023 Proxy Statement") stated the following about Defendant Porter:

*Mark Porter* has served as a member of our board of directors since December 2022. Mr. Porter has served as the Chief Technical Officer ("CTO") of MongoDB, a database platform company, since July 2020. Prior to MongoDB, Mark was CTO of Mobility at Grab, Southeast Asia's super app that provides everyday services such as ride-hailing, food, package, grocery delivery, mobile payments and financial services to millions of people, from October 2018 to July 2020. Prior to joining Grab, Mark was a General Manager at Amazon Web Services, from May 2013 to October 2018, where he led the Relational Database Service (RDS), Amazon Aurora and RDS for PostgreSQL, the AWS Database Migration Service, and the AWS Schema Conversion Tool. Prior to Amazon, Mark held various roles including CTO of a division of NewsCorp and Vice President of Engineering at Oracle Corporation, as well as working at NASA/JPL and being an early member of the Oracle Database Kernel group. Mark previously served on the board of directors of MongoDB from February 2020 to July 2020. He also served on the board of directors of Splyt, a global mobility company, from May 2019 through June 2020, and as a Board Advisor to MariaDB, a database company from March 2018 until January 2020. He holds a BS in Engineering and Applied Science from Caltech. We believe that Mr. Porter is qualified to serve as a member of our board of directors because of his executive leadership experience and experience in the technology industry.

**Defendant Saintil**

42.     Defendant Saintil has served as a Company director since November 2020. She also serves as a member of the Compensation Committee.

43.     The 2024 Proxy Statement stated the following about Defendant Saintil:

*Merline Saintil* has served as a member of our board of directors since

November 2020. Ms. Saintil is an experienced senior executive, having served a number of Fortune 500 and privately-held companies, including Change Healthcare Inc. (Nasdaq: CHNG), Intuit Inc. (Nasdaq: INTU), Yahoo! Inc., PayPal Holdings Inc. (Nasdaq: PYPL), Adobe Inc. (Nasdaq: ADBE), and Joyent, Inc. From April 2019 to February 2020, Ms. Saintil served as the Chief Operating Officer, R&D/IT, for Change Healthcare Inc., a payment management software company. Prior to joining Change Healthcare, Ms. Saintil was a senior executive in the Product & Technology group at Intuit Inc., a software company, from November 2014 to August 2018, where her core responsibilities included driving global strategic growth priorities, leading merger and acquisition integration and divestitures, and leading business operations for nearly half of Intuit's workforce. Prior to Intuit, Ms. Saintil served as Head of Operations for Mobile & Emerging Products for Yahoo! Inc. from January 2014 to November 2014. Prior to joining Yahoo!, Ms. Saintil held various roles at Joyent, Inc., a software company, from November 2011 to September 2013; PayPal Holdings Inc., a payments company, from July 2010 to November 2011; Adobe Inc., a software company, from April 2006 to July 2010; and Sun Microsystems, Inc. from October 2000 to April 2006. Ms. Saintil currently serves as the Lead Independent Director and Chair of the Compensation Committee of Rocket Lab (Nasdaq: RKLB) and on the boards of directors of Symbotic (Nasdaq: SYM) since June 2022, Evolv Technology Holdings, Inc. (Nasdaq: EVLV) since January 2021, and TD SYNNEX Corporation (NYSE: SNX) since September 2021. Ms. Saintil is the Chair of the Nominating and Governance Committee of Symbotic and Evolv Technology. She also served on the board of directors and as a member of the Information Systems Audit Committee of Alkami Technology from October 2020 to December 2022. She is certified in Cybersecurity Oversight by the National Association of Corporate Directors and the Carnegie Mellon Software Engineering Institute. Ms. Saintil holds a Bachelor of Science degree in Computer Science from Florida A&M University and a Master of Science degree in Software Engineering Management from Carnegie Mellon University and has completed Stanford Directors' College and Harvard Business School's executive education program. Ms. Saintil received a B.S. in Computer Science from Florida A&M University, an M.S. in Software Engineering Management from Carnegie Mellon University, and has completed Stanford Directors' College and Harvard Business School's executive education program. She is certified in Cybersecurity Oversight by the National Association of Corporate Directors and the Carnegie Mellon Software Engineering Institute and has completed Stanford Directors' College and Harvard Business School's executive education programs. We believe that Ms. Saintil is qualified to serve as a

member of our board of directors because of her executive leadership experience, product experience, and extensive experience in the technology field.

**Defendant Sullivan**

44.     Defendant Sullivan has served as a Company director since January 2020 and as the Lead Independent Director since March 2021. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

45.     The 2024 Proxy Statement stated the following about Defendant Sullivan:

*Godfrey Sullivan* has served as a member of our board of directors since January 2020 and as our lead independent director since March 2021. Mr. Sullivan served as President and CEO of Splunk Inc., an operational intelligence software company from 2008 to November 2015. Prior to that, Mr. Sullivan served as President and CEO of Hyperion Solutions, LLC, a business performance management software company, from October 2001 to June 2007. Prior to joining Hyperion Solutions, LLC, Mr. Sullivan served in roles of increasing responsibility from August 1992 to June 2000 at Autodesk, Inc., a 3D design software company. Prior to joining Autodesk, Inc., Mr. Sullivan served in roles of increasing responsibility from 1985 to 1992 at Apple, Inc., a multinational technology company. Mr. Sullivan has served as a member of the board of directors of CrowdStrike, Inc. a cybersecurity technology company, since November 2017 and Marqeta, Inc., a modern card issuing company, since May 2021. Mr. Sullivan previously served as a member of the board of directors of Splunk Inc., an operational intelligence platform company, from 2008 to March 2019, RingCentral, Inc., a provider of cloud-based communications and collaboration solutions, from April 2019 to March 2021, Informatica Corporation, a data integration software provider, from 2008 to 2013, and Citrix Systems Inc., an enterprise software company, from February 2005 to June 2018. Mr. Sullivan earned a B.B.A. in Real Estate and Economics from Baylor University. We believe that Mr. Sullivan is qualified to serve as a member of our board of directors because of his executive leadership experience and extensive experience as a director of public companies.

**Relevant Non-Parties**

46.     The Securities Class Action captioned *Dolly v. GitLab Inc., et al.*, No. 5:24-cv-06244-EKL, in the United States District Court for the Northern District of California, incorporates statements from former employees of GitLab who offered their experiences

as confidential witnesses.[3] The following are the former employees whose statements are referenced throughout this complaint before this Court.

**FE1**

47.    FE1 worked for GitLab between September 2022 and September 2024. During this time, FE1 was the Head of Global Cloud Partnerships, Ecosystem Sales from January 2024 to September 2024, and they were a Director, Strategic Partnerships, with a focus on the Google Cloud Alliance and ISV Partner Program, from September 2022 through December 2023.

48.    In their role as Director, Strategic Partnerships at the Company, FE1 was responsible for the strategy and relationship management with current and potential technology partners and large enterprises. In this role, FE1 reported to the Company's Vice President, Business Development and Strategic Partnerships, who then reported to Ashley Kramer, Chief Marketing Officer and Chief Strategy Officer of the Company.

49.    In their role as Head of Global Cloud Partnerships, Ecosystem Sales, FE1 was responsible for directing the ecosystem partner function at a strategic level across several specialties or functions, developing global frameworks, and collaborating with vice-president-level executives to incorporate these strategies into larger, overall business plans. In this role, FE1 reported to the Company's Vice President, Ecosystem Sales, who then reported to the Company's Chief Revenue Officer.

**FE2**

50.    FE2 worked for GitLab as a Customer Success Strategy Manager between August 2022 and July 2023. As Customer Success Strategy Manager, FE2 reported to Christian Conover, the Company's Director of Customer Success Management in the Americas.

51.    In their role as Customer Success Strategy Manager, FE2 had the

---

[3] As was done in the Securities Class Action, all former employees are referred to as gender neutral to preserve their anonymity.

responsibility of establishing relationships with executives at Fortune 500 companies with the intent of selling the Company's products.

**FE3**

52.    FE3 worked for the Company as a Senior Global Partner Program Manager between November 2021 and November 2024.

53.    In their role as Senior Global Partner Program Manager, FE3 worked on the design, management, and execution of the Company's global Partner Ecosystem Programs.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

54.    By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of GitLab and because of their ability to control the business and corporate affairs of GitLab, the Individual Defendants owed GitLab and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GitLab in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GitLab and its shareholders so as to benefit all shareholders equally.

55.    Each controlling shareholder, director, and officer of the Company owes to GitLab and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56.    The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of GitLab, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.    To discharge their duties, the controlling shareholder, officers, and directors of GitLab were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58.    Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the

highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of GitLab, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

59.     As controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

60.     To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and directors of GitLab were required to,

among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to GitLab's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how GitLab conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of GitLab and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GitLab's operations would comply with all applicable laws and GitLab's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other

financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.    Each of the Individual Defendants further owed to GitLab and the shareholders the duty of loyalty requiring that each favor GitLab's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.    At all times relevant hereto, the Individual Defendants were the agents of each other and of GitLab and were at all times acting within the course and scope of such agency.

63.    Because of their advisory, executive, managerial, directorial, and controlling positions with GitLab, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

64.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GitLab.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment,

waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

67.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of GitLab was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GitLab and was at all times acting within the course and scope of such agency.

## GITLAB'S CODE OF CONDUCT

70.    GitLab's Code of Business Conduct and Ethics (the "Code of Conduct") represents that it "is committed to the highest standards of legal and ethical business conduct and has long operated its business consistent with written operating principles and

policies that reinforce this commitment." The Code of Conduct goes on to state that it "summarizes the ethical standards for all directors, officers, employees and contractors of GitLab and of its direct and indirect subsidiaries ("Team Members ") and is a reminder of the seriousness of our commitment to our values."

71.    In the section "Conflicts of Interest" the Code of Conduct states, in relevant part:

> GitLab recognizes and respects Team Members' rights to engage in outside activities that they may deem proper and desirable, provided that these activities do not impair or interfere with the performance of their duties to GitLab or their ability to act in GitLab's best interests. However, all Team Members must avoid situations in which their personal interests may conflict, or appear to conflict, with the interests of GitLab.

72.    In the section "Special Ethics Obligations for Team Members with Financial Reporting Responsibilities," the Code of Conduct states, in relevant part:

> The Chief Executive Officer, Chief Financial Officer, and Finance Department personnel bear a special responsibility for promoting integrity throughout the organization, with responsibilities to stakeholders both inside and outside of GitLab. The Chief Executive Officer, Chief Financial Officer, and members of the Finance Department have a special role not only to adhere to these principles themselves but also to ensure that a culture exists throughout GitLab as a whole that ensures the fair, accurate, comprehensive and timely reporting of financial results. Because of this special role, the Chief Executive Officer, Chief Financial Officer, all members of the Finance Department and all other Team Members, must:
>
> - act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships;
>
> - provide information that is accurate , complete, objective, timely and understandable to ensure full, fair, accurate, timely, and understandable disclosure in reports and documents that GitLab files with, or submits to, government agencies and in other public communications;
>
> - comply with applicable governmental laws, rules and regulations, and acquire appropriate knowledge of such laws, rules and regulations relating to GitLab' duties sufficient to enable the Team Member to

recognize potential dangers and to know when to seek legal advice;

73.    In the section "Compliance With All Laws, Rules and Regulations" the Code of Conduct states:

> GitLab will comply with all laws and governmental regulations that are applicable to its activities and expects all Team Members to obey the law. Laws can be complex and at times, even counterintuitive. Although it's impossible to know all aspects of every law, you should understand the major laws, rules and regulations that apply to your work. You should consult with our CLO if you are unsure or have any questions or concerns related to your work. A few specific areas of legal compliance are discussed in greater detail below.

74.    In the same section, under the subheading "Insider Trading" the Code of Conduct states, in relevant part:

> Because we believe firmly in transparency and trust across the organization, you may find yourself in possession of inside information. The definition of inside information is any material nonpublic information, positive or negative, about GitLab or other organizations with which we work. For a definition of "material non-public information," please see our Insider Trading Policy. Remember that we also may possess confidential information about our customers, partners or other third parties. It is equally important that we treat this information with the same care that we treat our own.

> The bottom line is that we never buy or sell securities based on inside information, nor do we tip off others to do so. It doesn't matter how we learned the information—using material nonpublic information to trade securities is never acceptable. Doing so violates the law and the trust we have built with our fellow Team Members, and with our customers, partners and investors, and others.

75.    In the section "Financial Matters and Business Practices," in which the Code of Conduct states:

> You are expected to act responsibly and exercise sound judgment with respect to our finances and financial reporting. Investors rely on accurate and fair financial and business information to understand our financial results and make informed decisions. You may execute financial transactions only with

authorization and in compliance with our policies. You also are expected to record and report all financial transactions and business information honestly and accurately, to comply with our system of internal controls and to follow applicable laws, regulations and accounting practices.

We regularly file reports and other documents with regulatory authorities, including the U.S. Securities and Exchange Commission ("SEC"). In addition, we may make other public communications, such as press releases, from time to time.

Depending upon your position with the Company, you may be called upon to provide information to help ensure that our public reports and communications are complete, fair, accurate and understandable. You are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely and understandable answers to inquiries related to our public disclosures. Team Members involved in preparing public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures.

If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of our CLO. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should follow the procedures set forth in our Whistleblower Policy.

76.    In the same section, under the subheading "SEC Reporting and Financial Statements Preparation," the Code of Conduct states, in relevant part:

Our periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws, and SEC rules. If you contribute in any way to the preparation or verification of our financial statements and other financial information, you must ensure that our books, records and accounts are accurately maintained. You must also cooperate fully with our finance department, as well as our independent public accountants and counsel. If you are involved in the preparation of our SEC reports or financial statements, you must:

- Be familiar with and comply with our disclosure controls and

Verified Shareholder Derivative Complaint

procedures and our internal control over financial reporting.

- Take all necessary steps to ensure that all filings with the SEC and all other public communications about our financial and business condition provide full, fair, accurate, timely and understandable disclosure.

77.   In a section titled "Administration, Waiver, and Amendment," the Code of Conduct states, in relevant part:

The Audit Committee is responsible for administering the Code. It has established the standards of business conduct contained in this Code and oversees compliance. The Audit Committee has delegated day-to-day responsibility for administering and interpreting the Code to the CLO. While serving in this capacity, the CLO reports directly to the Audit Committee.

Any waiver of any provision of the Code for the benefit of a director or an executive officer (which includes without limitation, for purposes of the Code, GitLab's principal executive, financial and accounting officers), shall be effective only if approved by the Board in its sole discretion. Any waivers of the Code for other Team Members may be made by the CLO or Audit Committee.

78.   In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, six of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $223.4 million. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## **GITLAB'S AUDIT COMMITTEE CHARTER**

79.    GitLab also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of GitLab Inc. (the "Company") is to assist the Board in fulfilling its oversight responsibilities relating to:
>
> - the Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the Company's financial statements;
>
> - the qualifications, independence and performance of the Company's independent auditors (the "Independent Auditors");
>
> - the design, implementation and performance of the Company's internal audit function;
>
> - risk assessment and management; and
>
> - compliance by the Company with legal and regulatory requirements.
>
> This charter (the "Charter") sets forth the authority and responsibility of the Committee in fulfilling its purpose. The function of the Committee primarily is one of oversight. Although the Committee has the responsibilities and powers set forth in this Charter, it is not the Committee's duty to plan or conduct audits or to determine that the Company's financial statements are complete, accurate and in accordance with generally accepted accounting principles ("GAAP"). Instead, those are responsibilities of the Company's management and the Independent Auditors.

80.    Under the heading "Responsibilities and Duties," in a subsection titled "General," the Audit Committee Charter states the following:

> - The principal responsibilities and duties of the Committee are set forth below. These responsibilities and duties are set forth as a guide, with the understanding that the Committee will carry them out in a manner that is appropriate given the Company's needs and circumstances. The Committee may perform such other functions as are consistent with its purpose and applicable law, rules and regulations, as the Board may request or prescribe, or as the Committee deems necessary or appropriate consistent with its purpose.

- The Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management and the Independent Auditors, in accordance with its business judgment. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The Independent Auditors are responsible for auditing the Company's financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Committee to plan or conduct any audit, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles or applicable law, or to guarantee the Independent Auditors' reports.

81.    Under the same heading, in a subsection titled "Financial Statements and Disclosures" the Audit Committee Charter states the following, in relevant part:

i.    Prior to distribution to the public, review and discuss with management and the Independent Auditors, the Company's quarterly and annual financial results, earnings press releases and earnings guidance provided to analysts and rating agencies, and other public announcements regarding the Company's operating results.

ii.    Review and discuss the following with management, the internal auditors (if any), and the Independent Auditors, as applicable:

a) the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K;

b) the results of the Independent Auditors' audit or review of the financial statements;

c) all critical audit matters (CAMs) proposed by the Independent Auditor to be included in the Independent Auditor's annual audit report;

d) any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"); and

e) any significant issues, events and transactions as well as any significant changes regarding accounting principles, practices, policies, judgments or estimates.

82.    Under the same heading, in a subsection titled "Internal Controls" the Audit Committee Charter states the following:

i.    Review and discuss with the Company's management, its internal auditors (if any), and the Independent Auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of the Company's accounting and financial processes and systems of internal controls and material changes in such controls, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation.

ii.    Review any allegations of fraud that are disclosed to the Committee involving management or any Company directors, officers, employees and contractors ("Team Members") with a significant role in the Company's accounting and financial reporting process and systems of internal controls.

iii.    Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.

iv.    Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.

v.    Establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (b) the confidential anonymous submission by Team Members of the Company of concerns regarding questionable accounting or auditing matters. Oversee the review of any such complaints and submissions that have been received, including the current status and the resolution if one has been reached.

83.     Under the same heading, in a subsection titled "Internal Audit" the Audit Committee Charter states the following:

The Committee will oversee the design, implementation and performance of the Company's internal audit function, and approve any changes the Committee determines appropriate, if applicable, including:

   i.   Approving the annual internal audit plan and all major changes to the plan. Review the internal audit activity's performance relative to its plan.

   ii.  Reviewing and participating in the selection of individuals to, and any changes in, the Company's senior internal audit position.

   iii. Overseeing the internal audit function, including its objectives, responsibilities, independence, performance, annual plan and budget, and staffing.

   iv.  Periodically meeting separately with management and with internal auditors (or other personnel responsible for the internal audit function).

   v.   Reviewing the adequacy of the Company' internal audit charter annually and approving any changes the Committee determines appropriate, if applicable.

84.     Under the same heading, in a subsection titled "Risk Oversight" the Audit Committee Charter states the following:

   i.   Review with management the Company's major financial risks and enterprise exposures and the steps management has taken to monitor or mitigate such risks and exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.

   ii.  Review with management the Company's cybersecurity and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and respond to data breaches.

   iii. Review with management the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time.

   iv.  Review with management the Company's (a) programs for promoting and

monitoring compliance with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.

v.    Review the status of any significant legal and regulatory matters and any material reports or inquiries received from regulators or government agencies that reasonably could be expected to have a significant impact on the Company's financial statements.

85.    Under the same heading, in a subsection titled "Corporate Governance" the Audit Committee Charter states the following:

i.    Annually prepare a report to the Company's stockholders for inclusion in the Company's annual proxy statement as required by the Commission Rules.

ii.    Discharge the responsibilities as set forth in such policies, codes and guidelines approved by the Board.

iii.    Review the process for communicating the Company's Code of Conduct to Company personnel, and for monitoring compliance therewith.

iv.    Review the related-person transactions under the Company's Related Person Transaction Policy and applicable accounting standards on an ongoing basis and such transactions shall be approved or ratified by the Committee.

86.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

## **Background**

87.     GitLab was originally founded in 2011 as an open-source project before being launched as an open-core business model in 2014.

88.     Starting life as a Git repository, GitLab has since grown and expanded into a single platform solution that fully engulfs the entirety of the development lifecycle of software, from the planning stages all the way to production and security.

89.     One kind of methodology that combines software development (Dev) with IT operations (Ops), called DevOps. Using DevOps, a company can automate and improve the lifecycle of software development, increasing deployment frequency, and delivering products of higher quality on a shorter timeframe.

90.     Another methodology adds security (Sec) into the mix, known as DevSecOps. Utilizing DevSecOps, a company can streamline the development and operation with the additional emphasis of security and risk management. A company utilizing the DevSecOps methodology reduces any risk of releasing code that has vulnerabilities, ensuring that security is prioritized from the beginning of the lifecycle, and preventing undetected security issues from reaching production.

91.     The Company's main offering is its DevSecOps platform. This platform enables customers to perform project-based tasks, all the way from the planning stages through source code management, monitoring, and security. The Company's platform is intended to allow DevOps processes while also breaking down silos within personnel in a single, unified, platform, therefore eliminating the tool sprawl throughout a software's development life.

92.     The Company's platform is available through a self-managed and software-as-a-service ("SaaS") subscriptions. The self-managed subscriptions allow the customer to install GitLab on their own site or hybrid cloud environment. The self-managed subscription includes support, maintenance, upgrades, and updates on a when-available basis. Revenue for the self-managed subscriptions are recognized by providing customers

with access to a proprietary software license, meaning the revenue itself is recognized up-front.

93. The Company's SaaS subscriptions are managed by the Company and hosted either in the Company's public cloud or in a private cloud depending on what the customer prefers. The SaaS subscriptions provide access to the Company's latest managed version of its product. Revenue for SaaS subscriptions is recognized ratably throughout the contract period when the performance obligation is satisfied.

94. Terms of the Company's contracts with customers are between one to three years, with the average term being approximately 15 months. The pricing structure is broken into three tiers: Free, Premium, and Ultimate. The Company's Free tier provides customers with several features that encourage the use of the DevSecOps platform, solicit contributions, and serve as targeted lead generation for paid customers. The Company's entry-level paid tier, Premium, costs approximately $19 to $29 per user per month. The highest paid offering was the Ultimate tier, which costs $99 per user per month. The two paid tiers allowed access to additional features that were geared towards managers, directors, and executives.

95. Throughout the Relevant Period, the Company's revenue growth was comprised of 80% expansion from existing customers and 20% from first orders or new bookings. At this time, the Company estimated approximately 30 million or more registered users, including those who utilized the Free tier. As of January 31, 2024, the Company's Premium tier subscriptions accounted for approximately 56% of its total ARR.

96. The main contributor to the Company's DBNRR, historically, has been seat expansion, followed by tier upgrade to Ultimate, and lastly increase yield from the customer. As of January 31, 2024, the seat expansion represented approximately 40% of the Company's DBNRR, followed by an increased price yield at 40%, and lastly tier upgrade at 20%.

97.    On May 23, 2022, the Company's platform continued to evolve, as the next major update to the Company's DevOps platform, GitLab 15, was introduced. GitLab 15 introduced a platform that included all of GitLab's DevOps capabilities and combined them in a single platform. Among the new innovations included in GitLab 15 was the introduction of AI and machine learning onto the platform. In the months leading up to the start of the Relevant Period, the Individual Defendants continuously touted the platform's new AI capabilities and features.

98.    In accordance with the shift towards AI, on March 2, 2023, the Company announced an increase in the price of its Premium tier from $19 per user per month to $29, an increase of 53%.

***The Company's Former Employees Reveal the Issues of AI Integration in the Company's Product***

99.    Despite the Individual Defendants' consistent claims to the contrary, the testimony provided by the former employees in the Securities Class Action show the issues that arose with the Company's AI rollout. The former employees offered evidence showing that there was delayed deployment and unmatched capabilities of the AI features, as well as weak market demand for AI integration in the Company's product, negative customer feedback, and an overall rejection of the Company's new pricing model. All of this resulted in the lowered guidance for the 2025 Fiscal Year when the truth eventually emerged.

100.    For example, FE2's role with the Company was being the point of contact, in tandem with the Company's account executives, for its strategic accounts. Much of this involved escalating and triaging the issues account holders had with their products while ensuring the accounts were adopting the platform, as well as upselling where possible. FE2 summarized their role as working with the account executives and solutions architects to help customers maximize their investment on the platform.

101.    FE2 described that their time at the Company (August 2022 through July 2023) was the start of the Company's AI integration that was in the early stages of release. FE2's sole exposure to the Company's AI products was through the promotional videos

the Company had its representatives utilize in promoting the new features. FE2 claimed that the customers they worked with (mainly large enterprise clients) were only shown video demonstrations of the new advantages of the Company's AI assistance.

102.    During FE1's time at the Company (September 2022 through September 2024), the customer feedback of the Company's AI offerings was largely negative. According to FE1, the AI integration being offered by the Company was not something customers appeared to be excited about. FE1 also claimed that it was difficult to sell the AI features to customers, with FE1 going so far as to say that the Company's AI features were not at the level as was being publicly highlighted by the Individual Defendants.

103.    FE1 also claimed that Ms. Kramer, who held the positions of Chief Marketing Officer, Chief Strategy Officer, and interim Chief Revenue Officer, would exaggerate the Company's AI capabilities and other features. As such, according to FE1 this caused turbulence among the higher ranks of the Company, specifically between Ms. Kramer and vice presidents that FE1 reported to who ultimately left. FE1 also claimed that there was consistent conflict between the Company's senior executives, mostly between Ms. Kramer and Defendant Sijbrandij, as well as, on a smaller scale, Ms. Kramer and Defendant Robins.

104.    FE3 claimed that in their time at the Company (November 2021 through November 2024), they would take part in GitLab Assembly meetings, which were meetings that included all employees of the Company, including its senior executives, mid-quarter every quarter. During these meetings, which typically lasted about an hour, team members from anywhere within the Company were able to ask questions, as well as share upcoming important dates for the Company. As such, this enabled the Individual Defendants to learn about the development status of all product innovations at the Company, whether positive or negative. Among these discussions, according to FE3, were multiple discussions of the Company's AI offerings.

## **FALSE AND MISLEADING STATEMENTS**

### *June 5, 2023 Press Release*

105.    On June 5, 2023, the Company issued the Q1 2024 Earnings Release, which it also filed with the SEC as an exhibit to a Form 8-K filed that signed day and signed by Defendant Robins. The Q1 2024 Earnings Release detailed the Company's financial and operational results for the first quarter of the 2024 Fiscal Year.

106.    In listing the Company's "Business Highlights" in the first quarter, the Q1 2024 Earnings Release stated, *inter alia*: "Announced AI-powered workflows in a single DevSecOps platform with the introduction of Code Suggestions, AI-assisted vulnerability guidance, and Value Streams Dashboards to improve developer productivity across every phase of the software development lifecycle."

107.    The Q1 2024 Earnings Release also quoted Defendant Sijbrandij, who highlighted the Company's AI capabilities in stating: "With AI revolutionizing how companies develop, secure, and operate software, we believe GitLab is positioned as the leading AI-powered DevSecOps platform[.] … Today, we deliver more AI-powered capabilities to customers than any other DevSecOps platform."

108.    Defendant Robins was also quoted as highlighting the Company's shift to AI, stating that "Against a backdrop of macroeconomic uncertainty, customers are looking to our AI-powered DevSecOps platform to drive efficiencies, increase productivity, and accelerate their pace of innovation. We are poised to make the most of the estimated $40B total addressable market opportunity before us."

### June 5, 2023 Earnings Call

109.    That same day, the Company hosted a call with investors and analysts to discuss the first quarter results (the "Q1 2024 Earnings Call"). On the Q1 2024 Earnings Call, Defendant Sijbrandij went into more detail on the Company's developments with its AI features, stating:

> AI represents a major shift for our industry. It fundamentally changes the way that software is developed, and we believe it will accelerate our ability to help organizations make software faster. I'm excited about this new wave of technology innovation. We continue to focus on incorporating AI throughout our DevSecOps platform. ***We're innovating at a fast pace. In 1Q, we***

*delivered 5 new AI features. And in the first half of May alone, we delivered 5 additional features. All of these are available to customers now, and we continue to iterate on Code Suggestions. This feature allows developers to write code more efficiently by receiving code suggestions as they type. Code Suggestions is available on gitlab.com for all users while in beta. We expect Code Suggestions will be generally available later this year*. One of the guiding principles with Code Suggestions is to make it available and accessible to all developers everywhere.

*We also extended language support so that more developers can realize the benefits of AI on our platform. In 1Q, we increased language support from the initial 6 languages to now 13 languages*. Code Suggestions is uniquely built with privacy first as a critical foundation. Our customers' proprietary source code never leaves GitLab's cloud infrastructure. This means that their source code stays secure. In addition, model output is not stored and not used as training data. *AI is not only changing how software is developed, it's also amplifying the value of having a DevSecOps platform*. DevSecOps is a category that we created, and we're seeing it enter a mainstream adoption phase.[4]

110.    Defendant Sijbrandij continued on the Q1 2024 Earnings Call, detailing the rationale behind the pivot towards AI, stating:

*This quarter, we had many conversations with senior-level customers*, but one with the CTO from a top 5 European bank really stands out. At first, we focused on many of our differentiated features that only a DevSecOps platform can provide. For example, we talked about the benefits of Value Stream Dashboards, DORA metrics and compliance on a single platform. When the conversation moved into AI, a CTO said something extremely interesting. He said code generation is only one aspect of the development cycle. If we only optimize code generation, everything else downstream from the development team, including QAs, security and operations, breaks because these other teams involved in software development can't keep up. This point, *incorporating AI throughout the software development life cycle is at the core of our AI strategy*.

*Today, our customers have the ability to use Code Suggestions for code creation, Suggested Reviewers for code review, Explain This Vulnerability for vulnerability remediation, Value Stream Forecasting for predicting future team efficiency and much more. We're proud to have 10 AI features*

---

[4] All emphasis added unless stated otherwise.

*available to customers today, almost 3x more than the competition.*

*Applying AI to a single data store for a full software development life cycle also creates compelling business outcomes. We believe that this is something that can only be done with GitLab. We see a lot of excitement surrounding AI at the executive level. We are hearing from customers that AI is motivating them to assess how they develop, secure and operate software through a new lens. Enterprise-level companies who may not have been in the market until 2024, 2025, 2026 are reevaluating their strategies.* On top of that, there's new personas entering the mix. As chief information security officers navigate this new AI-powered world, they are working to empower their teams to benefit from AI and apply appropriate governance, security, compliance and auditability.

111.   Defendant Sijbrandij then went on to reveal the expectations for what AI will do to the market, stating:

*In all, we believe that AI will increase the total addressable market for several reasons.* First, AI will make writing code easier which, we believe, will expand the audience of people, such as junior and citizen developers who build software. Second, as these developers become more productive, we see software becoming less expensive to create. We believe this will fuel demand for even more software. More developers will be needed to meet this additional demand. And third, *we expect customers will increasingly turn to GitLab as they build machine learning models and AI into their applications.* As we add ModelOps capabilities to our DevSecOps platform, this will invite data science teams as new personas, and we'll allow these teams to work alongside their Dev, Sec, and Ops counterparts. We see ModelOps as a big opportunity for GitLab.

*Expanding the addressable market will also create an opportunity to capture greater value. Later this year, we plan to introduce an AI add-on focused on supporting development teams. This new add-on will include Code Suggestions functionality. We anticipate this will be priced at $9 per user per month billed annually. This add-on will be available later this year across all our tiers.* All of this innovation accentuates a broader theme for our business: the differentiation between a Dev and DevSecOps platform. We believe that an AI-powered platform focused solely on the developer persona is incomplete. It is missing essential security, operations and enterprise functionality.

*Remember, developers spend only a small fraction of their time developing*

*code. The real promise of AI extends far beyond code creation. And this is where GitLab has a structural advantage.* We are the most comprehensive DevSecOps platform in the market. Features like Code Suggestions and Remote Development are important accelerants for developer efficiency. *And to date, GitLab has more AI features geared towards developers than our competitors.* However, that isn't enough. In order to achieve a 10x faster cycle time on projects, enterprises need an end-to-end platform that works across the entire software development life cycle.

112.   Towards the end of his scripted remarks, Defendant Sijbrandij summarized his views on AI's impact on the Company, stating:

We also believe *we're in the early stages of capturing an estimated $40 billion addressable market*, a market that we've seen evolve from point solutions to a platform, from DIY DevOps to a DevSecOps platform. *And AI will speed up different aspects of software creation and development. This, in turn, creates the need for a more robust security, compliance and planning capabilities. In today's era of rapid innovation, the power of a platform like GitLab to enable faster cycle times truly shines.*

113.   During his own scripted remarks of the Q1 2024 Earnings Call, Defendant Robins discussed the impact of the recently implemented price increase on Premium tier customers, stating:

As we mentioned on the prior call, we raised the price of our Premium SKU for the first time in 5 years. Over that time frame, we added over 400 new features, transitioned from a Dev platform to a DevSecOps platform. We shared that we expected the Premium price increase to have minimum impact in FY '24 with greater impact in FY '25 and beyond. *The price increase, which took effect on April 3, is going as planned. We only had 1 month of renewals impacted by the price increase in the quarter. To date, customer churn is unchanged for the Premium customers who renewed in April, and our average ARR per customer increased in line with our expectations.*

114.   The question-and-answer portion of the Q1 2024 Earnings Call saw a number of analysts inquiring about the Company's AI capabilities. For example, in response to one question from a Piper Sandler & Co. analyst, Defendant Sijbrandij replied:

*Robbie David Owens – Piper Sandler & Co.*: I'm curious to hear an update on customer conversations. Obviously, a stronger-than-expected quarter, but we are seeing this deceleration, I think, across all high-growth tech companies. So [ I don't want to quote ] gen AI in the macro, how should we think about pressure on net retention rates, customer acquisition that's coming

from customers taking a more prudent approach in the current budgetary environment versus, I guess, rethinking needs for dev head count and reevaluating which dev tools to purchase just given all the gen AI innovations lately?

*Defendant Sijbrandij*: Yes, lots of things to unpack in your question. We see the macro trends continuing, and that's putting pressure on seat count. That was the same last quarter, and we anticipate that trend to continue. At the same time, we're super excited of what the macro is doing to the mindset of customers, because they say, hey, now we – it's time to consolidate. And at the same time, we see that the analysts are seeing that, hey, this is consolidating as a market. So we believe that DevOps platform is going to be the way that people will consolidate. We have the most comprehensive DevSecOps platform, which is also great if you look at the application of AI.

***We're able to apply AI not just for Code Suggestions but apply it across the entire spectrum. We have more than 10 features that we were able to ship. And those 10 features, they drive value at every part along the stage. And as for how that influences the TAM, which you alluded to, we think AI is going to make it easier for more people to enter the fray. So we think it was a supply of more people using the product.***

***At the same time, when you see that software development becomes easier, we believe there's going to be more demand for it. Software development used to be very expensive. AI makes it more affordable. There's going to be more demand. And more demand, again, means more people entering the fray.*** And last but certainly not least, it's an opportunity for us to manage not just the code that companies have, but also their models. And that's what we do with our MLOps functionality. We already allow you to run experiments with GitLab. We want to extend to a full MLOps managed platform where we add the data engineers to the constituents that use GitLab.

115.   In response to a question from a TD Cowen analyst about AI-related revenue opportunities, Defendant Sijbrandij replied:

*James Derrick Wood – TD Cowen*: And then just from a broader perspective, how you're thinking about the gen AI-related revenue opportunities in the quarters ahead?

*Defendant Sijbrandij*: So we're really excited about our partnership with Oracle Cloud. They have a great customer base. ***And what it means is that our customers now can now run AI and ML workloads on GPU-enabled***

*GitLab Runners on the Oracle Cloud Infrastructure, and that's a great powerful infrastructure. Additionally, we're available in Oracle's marketplace, expanding our distribution*.

116.   In response to a question from a Goldman Sachs analyst regarding the Company's AI capabilities as compared to competitors', Defendant Sijbrandij replied:

*Kasthuri Gopalan Rangan – Goldman Sachs*: I had a question on the generative AI capabilities. At what point are we looking to -- is there any need for further differentiation of GitLab versus the competition? This auto code generation feature that has been made much off, right, is that a real sticking point in conversations? Do you think the customer base really values and appreciates the broader set of AI capabilities that GitLab has to offer?

*Defendant Sijbrandij*: ***So we're really fortunate that we have a single application, a single data store for the entire DevSecOps cycle, and we can apply AI to all of them. And that's led us to having 3x as many publicly usable AI features as our competition. That is a big advantage*.** As long as at the beginning that, of course, you also need the code suggestions. But having the whole rest make sure that if you get more effective there, it works, and you get a faster cycle time throughout, and that's a really exciting development.

117.   In response to a question from a RBC Capital Markets analyst regarding what impact AI will have on the developer market, Defendant Sijbrandij responded:

*Mattew George Hedberg – RBC Capital Markets*: One of the questions that we get [] from investors the most is, does gen AI put pressure on developers -- I think you talked about a little bit in your prepared remarks. But maybe could you put a finer point on sort of the question of P times Q. And does the number of seats go down in the future? Or do you think it stays consistent or maybe even goes up?

*Defendant Sijbrandij*: ***Yes. The -- we believe that generative AI will expand the market. So first of all, you make the product easier. Liking coding today is hard, and AI makes it easier. So we expect the citizen developers, these junior developers to start coding. That code needs to be managed somewhere. And that is in GitLab.***
* * *
***One other way to look at it is you have generative AI. It produces more code. All that codes also needs to be secured, also need to put in operations. So if you don't have a good DevSecOps platform, you create a bottleneck at the beginning. That bottleneck is solved with the DevSecOps platform.***

118.    Defendant Robins then fielded questions regarding the price increase of the Premium tier. For example, one UBS analyst asked about whether the $9 per seat monetization plan would "accelerate a free-to-paid conversion." In response, Defendant Robins stated that, "I think that all that we're doing is to make the developer, the security and operations personas more efficient and to allow, make code better, faster, cheaper, more secure. And so I think anything that you do that enables that should help out on all the metrics that you track and model."

119.    An investor from MoffettNathanson LLC asked to expand on the impact of the increase in the price of a Premium subscription, to which Defendant Robins replied:

*Peter Sterling Auty – MoffettNathanson LLC*: Brian, just to -- and Sid, just another follow-up question just on the pricing. So you touched upon it, but I want to make sure to put a fine point here. Did it have any impact on win rates or length of deals where maybe customers were asking and negotiating a little bit harder because of the price increase? Or anything in terms of size of initial lands that may have been impacted because of the price increase? And if not, does that actually change when you think some of the benefits of the pricing increase will actually flow through the revenue line?

*Defendant Robins*: Yes. Thanks for that, Sterling. I guess for everyone on the call, let me just briefly touch on the price increase. We haven't raised prices in 5 years. And over that time period, we added 400 new features to the platform. And so that was the genesis of the price increase. The guidance we gave last quarter and today include the price increase. ***As you know, the price was effective in early April. And so we really only had a short period of less than a month for that. But I am happy to say that the renewal rates and the churn and the land of new customers have been better than expected***. And so we're happy with the results that we've seen in just that 1 month time period.

120.    Lastly, Defendant Robins was asked a question by a Scotiabank analyst regarding the mix of Ultimate and Premium subscribers, to which Defendant Robins replied:

*Nicholas William Altmann – Scotiabank Global Banking and Markets*: Just a follow-up on Matt's question on the Ultimate mix ticking up. It sounds like some of the strength there was driven from a business that was up for renewal in a smaller price point delta between Premium, Ultimate, and it also sounds

like there was some strength there just on net new customers landing at Ultimate. But I'm just curious given there's more renewal businesses sort of we progressed through 2Q in the second half, should we expect the Ultimate mix to continue to uptick here?

*Defendant Robins*: As we said before, and I think it's worth saying again, we don't compensate the sales team to sell Ultimate versus Premium. And so that is an output and not something that we're solving for. We want to deliver the best solution for the customer and get them a quick time to value and a positive business outcome. And so Ultimate had strength in the quarter. It's really driven by compliance, security and all the additional product features that Ultimate has. ***When you go through and look at Ultimate and look at expansion, first orders and so forth, Ultimate performed well in a lot of the categories as expected. And so where we saw some pockets of weakness was really in Premium on expansion of our existing clients*** as well as the contraction. Churn was relatively low, but we still saw some contraction as well. And so like I said, Ultimate had a good quarter. ***There was some pockets of weakness in Premium, I'll call them watch points that we continue to watch***. But overall, happy with what we delivered.

### September 5, 2023 Press Release

121.    On September 5, 2023, the Company issued a press release announcing its financial and operational results for the second quarter of the 2024 Fiscal Year (the "Q2 2024 Earnings Release"). The Q2 2024 Earnings release was also filed with the SEC as an exhibit to a Form 8-K filed that signed day and signed by Defendant Robins.

122.    The Q2 2024 Earnings Release quotes Defendant Sijbrandij in highlighting a strong quarter for the Company, which he attributed to rapid product innovation and strong demand. The Q2 2024 Earnings Release quoted Defendant Sijbrandij as stating, "GitLab's strong quarter is a result of our focus on creating a differentiated and innovative DevSecOps platform and executing on a strong go-to-market motion[.] …We believe that our rapid pace of product innovation and strong customer demand position us to capture a greater share of the estimated $40 billion total addressable market opportunity."

### September 5, 2023 Earnings Call

123.    That same day, the Company hosted an earnings call with investors and

analysts to discuss the financial results of the second quarter (the "Q2 2024 Earnings Call"). On the Q2 2024 Earnings Call, Defendant Sijbrandij highlighted the Company's AI capabilities, stating:

> AI continues to be a key area of product innovation. ***We are developing AI-powered capabilities across the entire software development life cycle. Let me share just a few of these capabilities. Code Suggestions uses generative AI to suggest code to developers. Suggested Reviewers leverages AI to identify the most appropriate reviewers of code. Explaining This Vulnerability provides details about potential security vulnerabilities in code***. And Code Suggestions remains on track to be generally available later this year. ***We differentiate our approach to AI in several ways. We have a commitment to privacy and transparency in our use of AI, and we also deliver AI throughout the entire software development life cycle***.

124.   Defendant Sijbrandij continued his scripted remarks of the Q2 2024 Earnings Call by discussing how the Company's AI capabilities and strategic partnerships can help it secure the DevSecOps market, stating:

> ***The second topic I want to discuss is how we intend to capture the large DevSecOps market opportunity with a strong go-to-market motion. Strategic partnerships are an important part of our go-to-market execution and I would like to highlight Google Cloud and AWS as 2 of the most significant***.
>
> GitLab and Google Cloud are strongly committed to delivering secure enterprise AI offerings across the software development life cycle. We are thrilled to be working with Google Cloud on delivering our vision of AI-powered workflows. We are leveraging [ PON2 ] foundational models, including the new coding model family to deliver new AI-powered experiences to all users involved in creating secure software.
>
> Our partnership with Google extends even further. At this year's Google Cloud Next, we announced our plans to integrate GitLab into the Google Cloud console. GitLab also received the 2023 Google Cloud Partner of the Year Award for the third consecutive year. Google recognized GitLab for our achievements in application development within the Google Cloud ecosystem.
>
> Another key partner is AWS. In Q2, AWS introduced support for GitLab in AWS code pipeline. This is a fully managed continuous integration and

continuous delivery service. This new AWS capability allows developers to leverage their gitlab.com source code repository to build, test and deploy co-changes with AWS code pipeline.

125. Defendant Sijbrandij closed his scripted statements on the Q2 2024 Earnings Call by again highlighting the Company's momentum in the results, stating:

In closing, *I'm pleased with our second quarter results. They demonstrate continued momentum and solidify our category leadership. With our recent analyst and customer validation, we are well positioned to win in the estimated $40 billion market opportunity. I'd like to thank our customers for trusting GitLab*. And I'd also like to thank our team members, partners and the wider GitLab community for their contributions this quarter.

126. During his scripted remarks on the Q2 2024 Earnings Call, Defendant Robins discussed the price increase of the Company's Premium tier and how its impacted the quarterly results, as well as expectations for its impact moving forward going into the 2025 Fiscal Year, stating:

I'm very happy with our key metrics in Q2 and that our revenue grew 38% year-over-year. I'd like to emphasize it's point about driving responsible growth as we achieved over 2,300 basis points of non-GAAP operating margin expansion. We continue to find ways to become more efficient while scaling the business to address our large market opportunity.

We also continue to make target investments in key product areas. These include security, compliance, AI and agile planning. *Part of our responsible growth strategy is to continue to optimize our pricing and packaging. In April of this year, we raised the price of our premium SKU* for the first time in 5 years. Over that time frame, we added over 400 new features. *We believe this better aligns price with value for our customers* and the investment we made over the past 5 years.

*In the first 4 months post launch, customer behavior was in line with our expectations. As a reminder, we anticipate minimal impact to our financials from this change in the current year. We expect the price increase to have a much larger impact in FY '25 and beyond*.

Looking back at the quarter. I want to touch on customer buying patterns, contraction and Ultimate trends. First, *customer purchasing behavior in Q2 was consistent with Q1 of FY '24. We believe buying patterns appear to have stabilized*. Second, contraction was lower than Q1 of FY '24 and appears to

be stabilizing. Third, Ultimate, our top tier continues to see strong adoption driven by customer wins for security and compliance use cases.

127.    Defendant Robins continued his scripted remarks, discussing the expected long-term positive impact of the increase of the Premium tier price, as well as the Company's plans to monetize the AI features, stating:

> We remain on track to achieve free cash flow breakeven for FY '25. ***There are a number of drivers we are introducing that we believe should help fuel our business in FY '25. I touched on the first one earlier, which is the price increase in our premium tier***. Additionally, in Q2, we started enforcing user limits on our free SaaS tier. It's early, but we have seen additional free users upgrade to premium. The third driver is the launch of Dedicated. This allows us to address new opportunity for companies with complex security and compliance requirements. ***Finally, we plan to monetize our AI capabilities by launching an add-on that will include code suggestions functionality later this year***.

128.    The discussion of the price increase of the Premium tier continued in the question-and-answer portion of the Q2 2024 Earnings Call. For example, in response to one MoffettNathanson LLC analyst's question regarding what customers are saying about the price increase, Defendant Robins responded:

> *William Fitzsimmons – MoffettNathanson LLC*: Obviously, earlier this year, you announced a price increase in the way that's structured a lot of that won't be felt until fiscal 2025 and 2026. But now that it's been several months, can you maybe give us an update on kind of what you're seeing and hearing from customers on the price increase, retention trends and stuff like that?

> *Defendant Robins*: And on the price increase, last quarter when we had our call, we only had a month of data. So happy to say we have 3 months of data this quarter. And I'm happy with the results. ***It's been in line to slightly above our expectations***. As a reminder, we implemented the price increase because we put 400 new features in the platform, and we wanted that to match the value that we are providing to our customer. And so the guidance that we provided for this quarter as well as the full year includes that impact. When we went -- ***when we announced the price increase, we talked about just due to the ratable nature of the revenue and renewals coming up through the year. There would be very little impact in FY 2024 and the majority of the impact would come in FY 2025 with all the impact realized in the year of FY 2026***.

129.   In response to a RBC Capital Markets analyst's question regarding whether the price increase of Premium has resulted in customer movement to Ultimate, Defendant Robins stated:

*Matthew George Hedberg – RBC Capital Markets*: Brian, your comment was customer behavior and the premium price increases in line with expectations. I just wanted to double click on that a bit. What does that mean? Does that mean that they're just – they're effectively taking the price increase? Are you seeing any -- I know it's not a factor, but typically that you've talked about, but are any moving to Ultimate? Just maybe a little bit more color on what in line with your expectations means?

*Defendant Robins*: Yes. Absolutely, Matt. When we did the price increase, we did an internal model that looked at bookings, churn, and we came up with what we thought our forecast would be on the overall net bookings. ***And so I would say overall bookings is more positive than our internal forecast and churn is less. And so we're seeing positive signs on every element of how we modeled it from a bookings and churn perspective***.

130.   In response to a Needham & Company analyst's question about any changes in the Company's assumptions pertaining to the price increase, Defendant Robins stated:

*Michael Joseph Cikos – Needham & Company, LLC*: I just wanted to make sure I'm kicking the tires here. I know you're talking in some of your comments to Matt that, hey, net bookings are slightly more positive. Churn is slightly below what you guys had forecast, which is great. But to be clear, like has there been any change as far as your assumption from this price increase to the guide? And can you remind us again, what is the benefit that you are including for this year's guidance when we think about the benefit from that price increase?

*Defendant Robins*: No, absolutely. Thanks, Mike. There's been – it's included in our guidance. And when you walk through the ratable nature of the revenue, it's very little impact this year. ***So where we are doing better than expected on the way that we modeled it internally from a bookings and churn perspective it doesn't have really any meaningful financial impact this year. We'll get the majority of the impact next year and then a little the following year***.

131.   There were also a number of questions pertaining to customer feedback on the AI features. For example, in response to a MoffettNathanson LLC analyst's question about

early customer feedback to the AI features, Defendant Sijbrandij replied:

*William Fitzsimmons – MoffettNathanson LLC*: Obviously, a few months ago, the firm held discussion with investors to talk through the generative AI-based products and then you gave us an update on Duo in AI in the prepared remarks. But maybe double-clicking and going a little deeper, and I can't imagine we're still in the early innings here. But curious if you could talk through kind of early customer feedback on these products' adoption trends, what you're hearing and seeing?

*Defendant Sijbrandij*: Yes. Thanks for the question. ***And the early feedback to Duo has been very positive. Customers get that they need AI features, not just for example, coding, but they need them throughout the DevOps life cycle***. And we've just published a report actually, we're publishing it today, the state of DevOps. And even for developers, which is only kind of 1/3 of a DevSecOps platform, only 25% of their time is spent coding, 75% of their time is elsewhere. So it's really important to have a set of features throughout the life cycle. We're really happy that we have 10 features out there already. And some of the oldest feature we have Suggested Reviewers has over 100,000 users today. So we're excited about progressing that further. ***And it's great to see that customers recognize that they need a suite of AI features, and therefore, we're excited about Duo***.

132.    In response to a Barclays analyst's question regarding whether customers are mostly focusing on code suggestions or if there are more leads on AI, Defendant Sijbrandij stated:

*Ryan Patrick MacWilliams – Barclays Bank PLC*: For Sid, for those customers who are evaluating adding large language model features to their DevOps platform today, are they still mostly focused on code suggestions? Or is there increasingly other considerations at play as these customers get smarter and more in the leads on AI?

*Defendant Sijbrandij*: Yes. I think as customers get more sophisticated, they're seeing that AI should be throughout the life cycle. As mentioned earlier in this call, like it's DevSec and Ops, like you need those AI features too to make security more efficient. If you just produce more co, that's not going to do it. And of those developers producing more co, that's not the only thing they need.

***So as customers get more sophisticated, they want more AI features, and we're really happy that we have 10 features out already***. The second thing

they want is good guarantees of privacy that their intellectual property is never going to be used to enhance other people their platform, their intellectual property. ***So I think in both, we have a really compelling story***.

133.   In response to a JPMorgan analyst's question regarding conversations pertaining to customers upgrading to the Ultimate tier, Defendant Sijbrandij replied:

*Pinjalim Bora – JPMorgan Chase & Co.*: Great. Congrats on the quarter. I wanted to ask you on Ultimate. As existing premium customers kind of look to pay the higher price, are you seeing some of the conversations lead to kind of upgrading to Ultimate, especially as you have to get people and flow in some of the AI capabilities as well like suggested reviewers. Are those conversations from premium customers looking to upgrade starting to happen more?

*Defendant Sijbrandij*: Yes, whatever we expect is baked into our guidance, but ***we're seeing that it is a reason for people to reevaluate which tier am I going to be on. And we're seeing Ultimate being more and more top of mind for people***. We haven't decided on the packaging of the AI features yet. So although AI is a significant part of the conversation, it's not driving Ultimate per se because we're still working on our packaging for the AI features.

134.   Lastly, in response to a question from a Piper Sandler & Co. analyst regarding the Company's DBNRR, Defendant Robins replied:

*Robbie David – Piper Sandler & Co.*: Brian, I just wanted to touch on the macro a little bit more. I appreciate the commentary and noting that NRR contracted again a little bit sequentially. So any guideposts you can put or rails around where that might go? I think you gave us a lot of indications around stabilization with behavior being consistent, some of the other metrics that you threw out. So just want to understand maybe where that NRR might bottom?

*Defendant Robins*: So as I mentioned earlier, we did see some stabilization in Q2 over Q1. Customers are still buying what they need. And so the fact that last year, they're buying a lot more. In this year, they're just buying what they need is why you're seeing a slight drop in the net dollar retention rate. I am happy to say that every year since we've launched is still expanding. And so customers are still buying more year-over-year than what they've bought historically. ***When you look at sort of – I've talked about historically that the watch point in the business was around contraction, and that was primarily contraction expansion primarily in our premium seats. I'm happy this quarter, we actually had a very good expansion quarter. Contraction has***

***leveled out, and churn has always been much smaller. But both of those are reflected in the guidance going forward***.

We didn't give out sort of what a target number is or where we think it will bottom out. If you look in the business, though, contraction started late in fourth quarter of last year. ***And so we're about 3 quarters into this. Average contract length is a little over 14 months. So I expect we have another quarter, 1.5 quarters to go until we work through the cycle of the new buying patterns***.

***September 7, 2023 Goldman Sachs Conference***

135.   On September 7, 2023, Defendant Sijbrandij took part in a presentation on behalf of the Company at the Goldman Sachs Communacopia & Technology Conference (the "September 2023 Goldman Sachs Presentation"). During the September 2023 Goldman Sachs Presentation, Defendant Sijbrandij was asked about customer buying behavior and the key metrics that have an impact on the Company's DBNRR, to which Defendant Sijbrandij replied:

*Kasthuri Gopalan Rangan – Goldman Sachs*: I'm curious, the big return on investment. And -- the -- I know you were early on to flag the macroeconomic concerns. But just to get the -- that part of the story out -- I mean it's a secular aspect in this cyclical aspect. This cyclical aspect everybody is going through what they're going through. Where are we -- are we done with the bottoming of all the metrics, the net expansion rate coming under pressure because of attrition, lack of expansion within your customer base? Where are we in that cycle?

*Defendant Sijbrandij*: Yes. We've announced earnings on Tuesday, and we said we see a stabilization. Q2 was very similar to Q1. And all of these metrics are now stabilizing the gross retention number for GitLab. It's a trailing metric over 12 months, but we're getting to the point next quarter, we'll be 1 year in and then that should stabilize as well.

136.   Defendant Sijbrandij was then asked of what customers have been saying about the Company in calendar year 2024, to which he replied:

*Rangan*: So as you talk to customers, and I've asked this question of every other CEO who is -- who have gone through probably 21, 22 CEOs and 5 CFOs. And I'll share with you what I've heard so far. But as you talk to customers, what are they saying about calendar '24?

*Defendant Sijbrandij*: I think everyone's cautious. We're looking forward to the next year. And we'll see some of the price increase effect to kick in. We've got a new product called GitLab Dedicated, which is a single-tenant SaaS offering that's super interesting for customers that want to have their own thing on their own private cloud that still want us to run the product. So we'll see the effects of AI KK more. We have 10 features now available to customers, but we'll be selling those. So we're looking forward towards next year, but if I could predict the macro economy, I probably wouldn't be a software CEO.

137.   Defendant Sijbrandij was then asked two questions pertaining to charging extra for the new features of GitLab, to which he replied:

*Rangan*: So the code generation feature once you get access to it, are you able to like GitHub copilot is whatever, x dollars, right? Are you able to charge a separate SKU or charge a premium?

*Defendant Sijbrandij*: Yes. We announced in earnings that it will be a separate SKU, and it will be priced at $9 at the beginning.

*Rangan*: That was sort of the expectation that was said before you or you already talked about it, right? So are you -- how comfortable are you that, that price will stick, that people will pay maybe you can ask for more?

*Defendant Sijbrandij*: Maybe you can ask for more. Maybe the costs are higher. Like it's very early, like things like inference costs are changing really, really rapidly. So it's hard to get that exactly right. The value creation is also -- generates a ton of code, but what is the value you can charge for it. And it's – that's all going to be very interesting.

138.   In response to a question about the Company's AI capabilities, Defendant Sijbrandij stated:

*Rangan*: So, when we look at the competitive environment, there is a quick tendency to conclude that Git[Hub] copilot has had tremendous impact, which it clearly has. How do you look at that cogeneration single trick which is an effective trick. Does that change the competitive landscape for you guys? Have you seen any changes at all evaluation, et cetera? I want to hear the answer to that, and then I have another question about your own cogeneration feature, which we've been expecting for quite some time.

*Defendant Sijbrandij*: Cool. Yes. We'll talk about that next. I think

cogeneration is important. We'll talk about our feature there. First, I think to give some context, we just released the State of DevOps report on Tuesday. And often people in the DevSecOps process, about half are developers, but they spend only 25% of their time coding. So if you make more effective, that's helpful. And it's also super helpful to help them with the other 75% of their time. And you've got to make the security and operations people also more effective.

Otherwise, you're going to get bottlenecked. So it's not just generating more code. For example, we have a feature -- an AI feature called suggested reviewers. It suggests the best reviewer for your code because most of the time that it takes to get something out to market, it's not time spent coding behind the keyboard, but waiting for the right -- to find the right person to review your code. So we now have 10 AI features usable by customers today, 3x more than the competition, and they help throughout that life cycle, and that's super important to get the overall efficiency up.

139.   In response to a question about anything regarding the Company's AI features that investors need to know about they already did not know, Defendant Sijbrandij replied:

*Rangan*: Tell us about the other AI features that you have that the competition does not have. And what is it that Wall Street needs to know and people like me and Gilly need to know that. That there -- this is the AI story of GitLab, that has not been told. What is that AI story?

*Defendant Sijbrandij*: Yes. So there's 10. I'm not going to go into all of them, we've talked about Code Suggestions, we talked about Suggested Reviewers. Another one is Explain This Vulnerability because -- the software is really good at saying, oh, these are the vulnerabilities we found. But then what's the next step? And AI can help you there give you context and see whether it applies to you.

140.   In response to a question about the Company's strategy on pricing, Defendant Sijbrandij responded:

*Federico Gilly – Goldman Sachs*: Yes. And so that does bring us to pricing and you guys released at GitLab 16, you guys really GitLab Duo. And you also recently did a price increase. Can you tell us a little bit about how you think your overall strategy for pricing? And then also how that manifest itself with a lot of the new generative AI tools?

*Defendant Sijbrandij*: Yes. So in April, we did a price increase for GitLab premium from $19 to $29. And it's been 5 years since we changed the pricing.

In that time, more than 400 new features came out that add a lot of value and allowed our customers to replace more point solutions. So we want to make sure we always generate more value than we captured, but it was the time to raise the price, and that's going to have an effect over a long time because contracts got to come up for renewal typically 12 months or more. Then there's the ratable nature of our revenue, and there's some – there's a legacy pricing for the existing customers.

### September 12, 2023 Piper Sandler Conference

141.   On September 12, 2023, Defendant Robins took part in a presentation on behalf of the Company at the Piper Sandler Growth Frontiers Conference (the "September 2023 Piper Sandler Presentation"). During the September 2023 Piper Sandler Presentation, Defendant Robins responded to a question about the Company's AI capabilities and the potential AI had on driving the Company's growth, with Defendant Robins stating:

*Robbie David Owens – Piper Sandler & Co.*: What's your impact on this say. I think, obviously, the streets perception has changed that we're not going to asymptotically approach 1 developer, right? It's not going to kill developments and that there is the more is more proposition, more is more is more proposition, I should say. To your business, you're going to release something either at the end of Q3, which is coming up or sometime in Q4. So between the next 20 and 110 days, I guess, you'll have a product in the market at $9 a month. How did you choose the pricing? Do you think you're effectively monetizing that? And what could this do to that free open source base that you have out there? Because it feels like there's a massive opportunity to go after the estimated 90% of seats that are using kind of a free-ish version?

*Defendant Robins*: Yes. So GitLabs pricing, the way that we price our product historically has been per seat per month. And so we had Ultimate and Premium, which you pay per seat per month. Everybody in the company has to be on the same tier, then we have the free version. And we have steered away from consumption. And we actually don't price differently between SaaS and self-manage even though SaaS is a little bit more expensive to deliver. We wanted to move the friction out of the selling and buying process to allow people to choose what they want. We want time to value and business outcomes for our customers. And so as we're thinking about the code suggestions and how to price that, we wanted to price it on a per user per month basis, but we didn't want to make you have to buy that with your sort of. … Core product. And so you can buy it for just who you want. You can

buy it for the free tier too. And so if you're on free, you want code adjustments. You can buy it if you're on Premium or Ultimate.

And so super happy with all the things we're doing today around AI. We have 10 products in development. One is actually GA called Suggested Reviewers. It's around workflow and suggesting who you should -- who should be the next person in the workflow. It's in Ultimate today. It's bundled with Ultimate. Code suggestions, we price at $9 per user per month. And then the other 8, we're working more on the technology. But look forward to them coming out and helping developers, operations and security professionals being more efficient.

142.    Defendant Robins was then asked a question pertaining to customer buying behavior, to which he responded:

*Owens*: So at the end of last year, I guess if we go back to last year here when we sat on the stage in this room, you were at a point where you just weren't seeing it yet, right? I don't think the macro had really impacted your business. And then at the end of the year, there was a pretty stark shift in the macro environments and fast forward 9 months from them or a year from when you were sitting next to me. And you've talked about stability in the second quarter. And I think to help frame the rest of the conversation, speak to the evolution that you guys have seen in terms of customer behavior, sales cycles and what have you?

*Defendant Robins*: When we talked about last year, we saw that basically you buy GitLab and you pay you're in advance and you're under your contract. And so when I was saying we weren't seeing contraction, we may have been having some small contraction in the base. But when they're coming up for their year renewal is when we really saw it and what we're seeing now is people are just buying differently. I don't know if in your other software companies, you've seen this, but I call it the executive [ VIX ] for spending has been really, really high. And so with all the layoffs and rush to get profitable and free cash flow breakeven, a lot of companies are just buying what they need.

Historically, procurement departments for my whole career would try to buy as much as they need for a year to 2 years. They would buy for future hires, future projects and then they would -- you wouldn't see them again until renewal time. And now what you're seeing is a lot of procurement departments are buying just what's needed, and they're fine buying 2, 3 or 4 times a year. And so one of the things I've talked about is churning [and]

contraction are very 2 different things. Usually, in companies, people have bundled them together. Churn has remained relatively low, but we've seen contraction primarily in premium and lack of expansion premium. And this is really attributed to the way that people are actually buying today versus how they bought in the previous year.

143.   In response to a question pertaining to the effect the increase in the price of the Premium tier subscription had on the Company's revenue growth, Defendant Robins responded:

*Owens*: And with the shorter durations that you mentioned relative to Ethan's question, we should be getting really excited about this price increase then next year. And I think we're modeling the knee in the curve to hit maybe middle of next year. Any thoughts or directionally how we can think about that?

*Defendant Robins*: And so with the price increase, we have 4 months of data now. And so last earnings call, we only had a month and so it wasn't really a lot that we could talk about. There was some confusion on impact this year versus next year. Due to the ratable nature of the revenue that we talked about will only get a small impact this year and so you have to look at overall bookings, part of that goes ultimate, the rest is premium, 80% what you got is existing customers. And so they go – it's a stair step up. And so we talked about the amount of impact this year being a nominal and most impact next year and then the remaining impact coming the following year. We haven't done our annual operating plan for next year. And so I look forward on our fourth quarter earnings call. Give out our guidance for FY 2025.

### *November 14, 2023 RBC Capital Markets Conference*

144.   On November 14, 2023, Defendant DeSanto took part in a presentation on behalf of the Company at the RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference (the "November 2023 RBC Presentation"). During the November 2023 RBC Presentation, Defendant DeSanto responded to a question pertaining to the Company's AI capabilities, stating:

*Matthew George Hedberg – RBC Capital Markets*: I guess from a high level -- from a product perspective, do you see a difference between -- I mean, we've been talking about AI forever. You see -- do you see -- I mean, and I know the answer partially, so it's leading the witness, but the real difference between AI and generative AI and what that means from a GitLab

perspective?

*Defendant DeSanto*: Yes. We are primarily using generative AI at GitLab. What I would say is instead of really talking about the differences between those, I think what would be great is to talk about how GitLabs doing it differently. Because everyone is saying they're including AI. And that's true.

I was just at CUBE con last week, it's big ops conference, and you couldn't walk 5 people out someone telling you that AI in their product. So GitLab, even though we're source available, we talked about Free. We're an open [ core ] company. We're very transparent. We end up in a situation where these are heavily regulated customers. These are people who have intellectual property, they can't have to go public and they come to GitLab to help them secure that.

And so when we were looking at AI, we had to ask ourselves what would make GitLab the best usage of AI and do it the GitLab way. And so we defined 3 tenants. The first was apply AI to the entire software development life cycle. When we recently just did our DevSecOps survey. If you've not read them, then they're amazing, there are full -- lots of great detail, we had over 5,000 respondents. What we found out that survey is that only 25% of the time that is on writing software. And if that's the case, then if you just accelerate that one part, the developer part, you're not really helping your organization get better.

The second was we want to be privacy and transparency first. What that means is that from a privacy standpoint, your code stays your code, we don't use it to train or fine-tune our models. And the transparency part is that you could literally go to get lab documentation at stocks@gitlab.com. And you'll see every model we're using and how it was trained. ***And so that has allowed customers to feel more comfortable adopting it***. GitLab is trusted by more than 50% of the Fortune 100 to secure their intellectual property. That's an outstanding number, right? You talked about security started essentially 4 years ago in the product, and now we're the trusted provider.

And then the final one was we really wanted to focus on best-in-class AI. And what that means is picking the right model for the right use case. ***And so we currently have between 12 and 16 models we use to Power GitLab for our AI features***. And so if you combine those all together, that's how GitLab is doing AI differently. ***And it's really helping people adopt the GitLab Duo, which is our suite of AI-powered DevSecOps workflows***.

145.   In response to a question about potential future features that would be AI-based, Defendant DeSanto replied:

*Hedberg*: So today, it manifests itself also in code suggestion on module. Do you see multiple sort of add-on features in the future that are kind of AI-based? I mean how do you think -- and I guess there's a question of how do you think again about what makes it into the base an Ultimate tier versus an add-on?

*Defendant DeSanto*: It's a great question. So just an update for everyone, no one saw the press release ***last week, we actually announced code suggestions will be GA in December. Very excited about that. We've had a lot of customers turn it on and use and give us feedback***. And also last week, we announced this week on the 16th, which I think is Thursday. I know honestly, I've been all over the world at the week it is. ***The Duo chat function will go into beta, which means we'll be available to a lot more customers and be monetizable***.

146.   In response to a follow-up question pertaining to the Duo function, Defendant DeSanto replied:

*Hedberg*: Is that an additional add-on?

*Defendant DeSanto*: ***It's part of the existing add-on we announced, which has the introductory price of the $9, but it'll also be available to customers in Ultimate. So to answer your question, we're looking at where the AI future fits and who it benefits, and that's driving where it goes into the product***. Today, we have nothing that's going to be in the Free tier related to AI but things like our vulnerability summary, which I mentioned a couple of minutes ago, a customer share[d] how that allowed them to drop some of their training material. That feature will explain the vulnerability in natural language, given an example of the code being exploited, given an example of that code being fixed in the developer's programming language.

And so that feature is going to go in Ultimate because it's fall on top of GitLab Ultimate. And so that's how we're looking at it. It's like where is the future fit? What to build on top of and what's going to give our customers the best boost.

147.   In response to a question about any additional add-on features, Defendant DeSanto replied:

*Hedberg*: So then that's – it's a great sort of like dichotomy of how you think about adding. Do you see a world in the future where there might be 2, 3, 4

different add-ons that are sort of very specific to a use case?

*Defendant DeSanto*: Yes. I mean it's a great question. Some of that's probably forward-facing stuff. I can't talk about in the quiet period here. But what I would say is that ***we're finding ways to monetize the product in a way that is best for our customers. That includes -- we shared with our customers, we have a planned add-on that's available this week. That's helping to bring in the nontechnical people and to GitLab Ultimate. And so we're always looking for ways to do that***. We realize just Premium or just Ultimate can be very restricting.

***December 4, 2023 Press Release***

148.   On December 4, 2023, the Company issued a press release announcing its financial and operational results for the third quarter of the 2024 Fiscal Year (the "Q3 2024 Earnings Release"). The Q3 2024 Earnings release was also filed with the SEC as an exhibit to a Form 8-K filed that signed day and signed by Defendant Robins.

149.   In listing the Company's "Business Highlights" from the third quarter, the Q3 2024 Earnings Release revealed, *inter alia*:

- Announced updates to GitLab Duo, the company's suite of Artificial Intelligence ("AI") capabilities, including:

  o The beta release of GitLab Duo Chat, a natural-language AI assistant that provides users with real-time guidance, insights, and suggestions to help analyze code, assist with planning, understand and fix security issues, and troubleshoot CI/CD pipeline failures.

  o Code Suggestions, which helps development, security, and operations teams create new code and update existing code to reduce cognitive load, improve efficiency, and enable them to build more secure software faster, will be generally available in the GitLab 16.7 December 2023 product release.

  o The beta release of Vulnerability Summary, which provides AIgenerated explanations of security vulnerabilities and suggestions for how to fix them.

150.   The Q3 2024 Earnings Release includes a quote from Defendant Sijbrandij, who highlighted the Company's DevSecOps platform integrating, among other things, AI,

as the reason behind the successful quarter, with Defendant Sijbrandij stating, "We delivered a strong quarter, which was driven by the continued adoption of our DevSecOps Platform[.] … GitLab is the only DevSecOps company that integrates security, compliance, and AI into one platform. With enterprises facing complexity from all directions, they need a partner to help them realize business value. GitLab helps improve developer productivity and reduces software spend, which is why our customers report seeing 7x faster cycle times with GitLab."

151.    The Q3 2024 Earnings Release also quotes Defendant Robins, who revealed that "Revenue grew 32% year-over-year, which demonstrates continued business momentum driven by our market-leading platform approach[.] … We continue to grow responsibly and delivered over 2,200 basis points of non-GAAP operating margin expansion. I am pleased to share that we had our first quarter of non-GAAP operating profit while continuing to invest in key product areas including security, compliance, AI, and Enterprise Agile Planning."

### December 4, 2023 Earnings Call

152.    That same day, the Company hosted a call with investors and analysts to discuss the third quarter results (the "Q3 2024 Earnings Call"). During his scripted remarks on the Q3 2024 Earnings Call, Defendant Sijbrandij touted the Company's AI features, stating:

> Now I'd like to discuss our second topic, which is our unique approach to AI. **We already have 14 AI features available to our customers**. That's more than any other DevSecOps platform we continue to innovate. **GitLab Duo is our suite of AIpowered DevSecOps workflows that enables customers to boost speed and efficiency without sacrificing privacy, security and compliance**.
>
> We have 3 principles in our AI strategy. First, we're the only platform that integrates AI throughout the entire software development life cycle. As developers become more effective, we enable security and operations team members keep pace. Also, developers only spend 25% of their time writing code. AI within DevSecOps should focus on more than just code creation.

Second, we are privacy and transparency first in our approach to AI. ***Our customers are eager to use AI***, but they want to do so responsibly. To support them with this, we do not use their code to train the AI models used by other customers. Our privacy-first approach is why more than 50% of the Fortune 100 trust GitLab to secure their intellectual property.

And third, our AI is powered by a diverse set of models from technology partners as well as our own AI models. That allows us to select the best AI model for each use case.

153.    Defendant Sijbrandij's scripted remarks continued, with him discussing GitLab Duo and its recent launch:

> ***In Q3, we released the beta of GitLab Duo Vulnerability summary***. This is a cool feature that provides AI-generated explanations of security vulnerabilities and suggestions for how to fix them. ***Another example of our progress is GitLab Duo Code Suggestions, our AI-powered code creation feature. It will be generally available in our December product release. We have been hearing from our customers that they are seeing efficiency improvements upwards of 50% with Code Suggestions***.
>
> ***And finally, we recently announced the beta release of GitLab Duo Chat***. With GitLab Duo Chat users can quickly understand project status, get help with planning and configuration, receive explanations of suggested code and generate tests, all without contact switching. To start, GitLab Chat is available within GitLab UI, Web IDE and VS Code. We plan to add support for more editors in the future.

154.    Defendant Sijbrandij's remarks also included how customers were reacting to the Company's AI features, stating:

> ***Our approach to AI is resonating with our customers***. For example, Amado Gramajo, Vice President of Infrastructure & DevOps at Nasdaq, recently shared his excitement about how Gitlab Duo will help Nasdaq protect their intellectual property and stay in line with regulatory mandates. And presenting at this year's Gartner Application Innovation Summit, Bal Kang at NatWest said, "GitLab Duo enables our developers to be more productive, efficient and successful in creating secure code. We're excited to see the benefits of GitLab's AI features across the entire value chain, and even our most seasoned engineers are seeing value."

155.    During his scripted remarks on the Q3 2024 Earnings Call, Defendant Robins discussed customer buying behavior, stating:

Looking back at the quarter, I want to share some of the areas we have been closely monitoring. These include sales cycles, win rates, contraction and Ultimate. In comparing Q3 with Q2 of FY '24, we have seen overall sales cycles lengthen. During Q3, buying behavior in our Enterprise segment stabilized. ***However, in the mid-market and SMB, we see customers continue to be cautious in an uncertain macro environment***. We have adopted our go-to-market approach in this environment to deliver predictable and strong results.

In Q3, our win rates have improved, signaling that the value proposition of the DevSecOps platform is resonating in the market. Contraction during Q3 also improved for the third consecutive quarter and is in line with levels from Q3 last year.

156.    Defendant Robins continued, reiterating that the increase in the price of a Premium tier subscription would have a long-term positive impact, stating:

There are a number of drivers we believe will fuel our business in FY '25 and beyond. At our core, continuing to deliver customer value with our DevSecOps platform aligns our success with our customers' success. Additionally, in April this year, we raised the price of our Premium tier for the first time in 5 years. Thus far, customer behavior has been in line with our expectations, although as a reminder, we anticipate the real financial impact from this change through FY '26.

157.    Defendant Robins also highlighted the Company's AI capabilities and the Company's intent to monetize them, stating:

The final driver for FY '25 and beyond is the monetization of our AI capabilities. Last month, we announced the general availability of GitLab Duo Code Suggestions is expected in our December product release.

158.    During the question-and-answer portion of the Q3 2024 Earnings Call, Defendant Robins was asked about how the impact of the Premium tier price increase changed customer behavior, and therefore would impact the guidance. Defendant Robins replied:

*Michael Joseph Cikos – Needham & Company, LLC*: I did just want to double check. So the first piece here, Brian, appreciate the update. It sounds like the Premium price SKU increase is tracking in line with expectations. Just wanted to see if there was any more color you could parse out there and if that in any way or your assumptions for that Premium price SKU is -- has changed when we think about that Q4 guidance that you guys are putting out there today?

*Defendant Robins*: Yes. Thanks, Mike. We're happy with the performance of the Premium price SKU. It's in line with what we modeled. One of the things that we've noted is first orders, especially in SMB and mid-market, are lower than expected. And you'll see some of that in the base customers of greater than $5,000. But overall, we're happy with the Premium price impact, and it's in line with our expectations.

159.    Defendant Sijbrandij received a number of questions during the question-and-answer portion of the Q3 2024 Earnings Call about the Company's AI feature and ability to drive revenue growth. For example, in response to one question about the Company aligning its AI efforts with Google, Defendant Sijbrandij replied:

*Kasthuri Gopalan Rangan – Goldman Sachs*: And second and final, the – we've been waiting for Google to more closely align or for you to closely align your generative AI efforts with Google. How close or how far are we from a full-blown integration and announcement of sorts?

*Defendant Sijbrandij*: **Yes, the customer feedback on our AI functionality has been positive**. And as you might have heard in the prepared remarks, customers like NatWest and Nasdaq are using it in their engineering teams and seeing the value and the productivity and efficiency that it brings.

Our customers have reported efficiency improvements upwards of 50% with Code Suggestions. We recently spoke with a leading international travel agency, and they said that the features they tested, they believe that GitLab offers a better quality there. We also spoke with a multinational financial technology company, and their team is excited about using GitLab Duo for generating configurations, test generation, book finding and automating operational work. So we're very excited that we have a broad platform so that we can do AI across the life cycle with 14 features for customers available today.

160.    In response to a Scotiabank analyst's question about adding functionality for Ultimate tier customers, Defendant Sijbrandij responded:

*Nicholas William Altmann – Scotiabank Global Banking and Markets*: I wanted to build on Ryan's question just around the generative AI functionality with GitLab Duo. It sounds like there's not going to be really any difference in feature functionality and sort of folding in some of the new enhancements into SaaS and self-managed. But I wanted to ask how you guys think about layering additional feature functionality into Premium versus Ultimate and

whether there's going to be kind of any difference there. And then just as a follow-up to that, as you sort of layer in more functionality into that Ultimate SKU, more broadly, how do you think about pricing?

*Defendant Sijbrandij*: Yes, I think the -- our Code Suggestions, I think, is very comparable to market. But I think ***what's unique about GitLab is having 14 AI features in the platform available to customers today. I think that's a big differentiation***. As for how do we sell it, some features will be a different SKU, for example, Code Suggestions, and that's then available not just to Ultimate and Premium but also free customers that might be not paying for GitLab today. I think that's an exciting opportunity, especially over the long term. And then some of the features we're going to put into Ultimate or Premium, and there might even be extra SKUs we introduce in the future.

161.   In response to a Keybanc analyst's question about whether customers using more cloud is driving demand, Defendant Sijbrandij responded:

*Michael Turits – Keybanc Capital Markets Inc.*: Right. I guess I meant it more from a general demand perspective. In other words, people are using more cloud. Is that driving more need, demand for GitLab subscriptions, seats, et cetera? And again, what's really offsetting that SMB weakness that drove the upside in the quarter?

*Defendant Sijbrandij*: I think that with GitLab, it has the biggest benefit the more complex your organization is. So the more complex your security and governance, the more heterogeneity in your projects where you go from kind of having projects on mainframe to the latest agile, that is where we can really shine. By bringing that all together in 1 platform, we typically see a 7x acceleration of cycle time. So give us the hardest problems, that's where we shine. And the enterprises are having the hardest time of kind of having to move really fast, having all that -- all these things, they have to move at the same time but having the most compliance and security questions to do.

***We do believe if you look at the overall market, so far, it's just going to keep getting more complex. You get AI now. You'll have more regulatory friction coming for everyone. So that gives us a lot of optimism about the future.***

162.   Defendant Robins also received questions regarding the premium price increase. For example, in response to one analyst's question about transitioning from free-to-pay usage, Defendant Robins replied:

*Matthew George Hedberg – RBC Capital Markets*: Congrats from me as well.

Maybe for either of you. One of the drivers that we think about over the next couple of years is free to pay. I think you guys have changed slightly sort of how you think about free-to-pay usage within your base. Can you talk a little bit more about that philosophically? And are you seeing any benefit from that in the Q3 results?

*Defendant Robins*: Yes, Matt, I'll take that. Thanks for the question. And so we did implement a user limit on gitlab.com, and it's led good conversion from free to paid. However, the vast majority just fall below $5,000, the base customer limit that we report, and so the impact is relatively low. We're continuing to pursue that product-led growth. We think it will be – it's built into our guidance. And so that's on free to pay.

I'll also take this as just an opportunity. I know a lot of you have had a wide range of outputs in the model for FY 2025 related to the Premium price increase. We're halfway through our planning process right now. So we aren't giving guidance for next year. It's still a bit early. But the early work that we've done, we believe that the Premium price increase will contribute roughly $10 million to $20 million in revenue for next year. And so it should help you out from a modeling perspective.

163. In response to a Wolfe Research, LLC analyst's question about the NRR has been for Premium customers, Defendant Robins responded:

*Allan M. Verkhovski – Wolfe Research, LLC*: Just a quick last question for me. Brian, that $10 million to $20 million benefit comment you made for next year's number, from the pricing increase was really helpful. Would love to understand what gross turn or NRR has been for Premium customers renewing over the last few quarters? And what kind of rough assumptions are you using to get to that $10 million to $20 million [ still ] in next year?

*Defendant Robins*: Yes. So similar to what we walked through before, where we took a certain amount of bookings, we saw when they're coming up for renewal what the stage would be with the 1 year for existing customers and then the price increase for new customers and then taking an average of -- our average contract term right now is roughly about 15 months and in building that waterfall model.

And so I've talked about historically that it is ratable, and you have to build the ratable sort of nature of the waterfall out. Since there's been so many estimates that have come out in the various models, we thought it would be good just to quantify what the impact for next year would be to help you with

your modeling.

164.    The statements in ¶¶105-163 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's AI capabilities did not reach much of what was advertised; (2) upon announcement, the AI feature were not made as widely available as advertised; (3) the Company's demand for AI integration was lower than expressed due to security and data privacy concerns; (4) the Company's customer feedback on its AI capabilities was largely negative; (5) AI integration into the Company's platform was not viewed as adding value; (6) the Company was experiencing slowed net seat expansion due to the increase in the Premium tier price; and (7) as a result of all of this, the Company experienced a decline in expansion growth in its Premium tier, which led to a reduction in the Company's revenue guidance for the 2025 Fiscal Year. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

<u>**The Truth Starts Emerging as False and Misleading Statements Continue**</u>

### *March 4, 2024 Press Release*

165.    On March 4, 2024, the Company issued its press release announcing its results for the fourth quarter and year-end of the 2024 Fiscal Year (the "FY 2024 Earnings Release"). The FY 2024 Earnings Release revealed a quarterly revenue of $163.8 million, a 33% increase year-over-year from the same quarter the year prior, as well as an annual revenue of $579.9 million, a 37% increase year-over-year.

166.    In announcing the guidance for the upcoming 2025 Fiscal Year, the FY 2024 Earnings Release revealed an expected revenue range of between $725 to $731 million, representing a growth rate of only 26% year-over-year. This disappointing guidance was revealed at the same time as the Company's announcement of Duo Pro, a paid add-on for its AI features, for $19 per user per month.

### *March 4, 2024 Earnings Call*

167.    That same day, the Company hosted an earnings call with investors and

analysts to discuss the financial results (the "FY 2024 Earnings Call"). During the FY 2024 Earnings Call, it was acknowledged that the lower-than-expected guidance was the result of "normalization in buying behavior." In turn, the Company's "guidance philosophy" was expected to be "less conservative this year than in the first 2 years."

168.   During the question-and-answer portion of the call, Defendant Robins reminded investors that the Company needed time for its new paid add-ons to "build its pipeline and close deals on new products" before it would have a "meaningful impact in [GitLab's] ratable business model."

169.   During the FY 2024 Earnings Call, Defendant Robins also reminded investors that the Company annually evaluates its SSP to determine its upfront revenue recognition rate. At the time of the FY 2024 Earnings Call, the Company had not yet finished its SSP analysis for the 2025 Fiscal Year, and therefore that was not a factor in the current guidance.

170.   On this news, the price of the Company's stock fell $15.62 per share, or approximately 21%, from a close of $74.47 per share on March 4, 2024, to close at $58.85 per share on March 5, 2024. However, the Individual Defendants continued to obfuscate the truth about the Company's failures in its AI integration and demand.

171.   For example, during the question-and-answer portion of the FY 2024 Earnings Call, Defendant Robins fielded questions pertaining to how customer buying behavior has impacted the guidance, with Defendant Robins stating:

> *Shebly Seyrafi – FBN Securities, Inc.*: So I think in prior quarters, you noted that sales cycles for the SMB, mid-market have been elongated, and in this quarter, you said enterprise did better than expected. So did SMB continue to be more challenged? Did the sales cycles improve? Just elaborate on what you're seeing in the SMB, mid-market segment.
>
> *Defendant Robins*: Thanks for that, Shebly. We're seeing customer buying behavior normalizing across the board. We didn't break out the sales cycles for SMB and mid-market in particular. But as I said, the churn and contraction, it's best that we see in 6 quarters, and sales cycles have normalized across the board.

172.   In response to a question from a UBS analyst regarding the Company's more conservative approach to guidance, Defendant Robins responded:

*Karl Emil Keirstead – UBS Investment Bank*: Maybe for Brian. Brian, to your comment that you're electing to take a less conservative posture on the guidance, maybe a two-parter. Why – what's the logic there? Is it just that GitLab is now a big organization across a bigger scale and customer base, you've just got a little more precise visibility? Is that it? Or is it in reaction to the environment?

*Defendant Robins*: Yes. Thanks for that, Karl. Going into our third year as a public company and also seeing the normalization of buying behavior, we'll just be less conservative in the guidance that we're giving out.

*Keirstead*: Okay. And then I guess the follow-up would be did you make that change for the fourth quarter such that the beat you just put up in the January quarter might -- we can look as kind of a start of this more conservative guidance posture. Or is it more going forward?

*Defendant Robins*: No, it's more going forward. Very happy with the bookings this quarter. We had the largest bookings quarter in company history. There is many firsts within the quarter: largest hyper-scaler contribution, largest first order, largest Ultimate, and we had a greater number of $1 million-plus deals. There was some linearity in the quarter. Things came more back in, in the quarter than expected.

173.   In response to a Needham & Company analyst's question pertaining to changes in customer behavior, Defendant Robins replied:

*Michael Joseph Cikos – Needham & Company, LLC*: I know in the Q&A, I think you had called out, from a linearity perspective, the quarter seemed to be a little bit more back half weighted. And so just curious -- again, we're trying to get our arms around this guidance here. Was there any change in customer behavior or purchasing patterns as we moved into -- we now have, call it, a month or 2 under our belt for the current quarter? Or were things relatively unchanged as far as the spending patterns you're seeing?

*Defendant Robins*: Yes. Thanks for that. We typically haven't commented sort of up into earnings. We comment sort of up until the quarter close. And we did see normalization across the entire -- across enterprise, mid-market and SMB. And I've also mentioned that we saw churn and contraction back to what we've seen 6 quarters ago. And so that obviously gave us some

confidence to give the guidance that we gave.

174.   In response to a RBC Capital Markets analyst's question regarding free-to-pay, Defendant Robins responded:

*Matthew George Hedberg – RBC Capital Markets*: You mentioned a number of the drivers in the prepared remarks. One that I don't think you talked about was free to pay, and I know there's been an increased focus on that. Any update on that sort of focus? Because it really does feel like that's a real long-tail opportunity, but curious if there's anything to mention there.

*Defendant Robins*: Yes. Thanks, Matt. We are getting a lot of free-to-paid conversion. However, the numbers are relatively low, so they don't come into the base customer count. And if you look at the overall sort of ARR that they're contributing, it's relatively small at this point.

175.   Lastly, in response to a question from a Blair & Company analyst regarding trends in NRR, Defendant Robins responded:

*Jason Noah Ader – William Blair & Company, LLC*: Brian, just trying to square, I guess, with everybody else the guidance with the less conservative posture comment. In particular, if NRR is trending up and is around 130%, doesn't this imply that NRR would have to decline from here for revenue growth to be in the mid-20s?

*Defendant Robins*: There's a number of factors that go into our guidance. We build it from a bottoms-up perspective. And I would just say that what we reported was actuals and what we're guiding to is guidance, right? So it's not comparing apples to apples.

176.   The statements in ¶¶171-175 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's AI capabilities did not reach much of what was advertised; (2) upon announcement, the AI feature were not made as widely available as advertised; (3) the Company's demand for AI integration was lower than expressed due to security and data privacy concerns; (4) the Company's customer feedback on its AI capabilities was largely negative; (5) AI integration into the Company's platform was not viewed as adding value; (6) the Company was experiencing slowed net seat expansion due to the increase in the Premium tier price; and (7) as a result of all of this, the Company experienced a decline in expansion growth in its Premium tier, which led to a

reduction in the Company's revenue guidance for the 2025 Fiscal Year. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2024 Proxy Statement*

177.    On April 30, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

178.    The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Bedi and Bostrom to the Board for a three-year term; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year; (3) approve executive compensation on an advisory basis; and (4) approve an amendment to the Company's Certificate of Incorporation to limit the liability of certain officers as permitted pursuant to the Delaware General Corporation Law.

179.    With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated:

> We have adopted a Code of Business Conduct and Ethics that applies to all of the members of our board of directors, officers and team members. Our Code of Business Conduct and Ethics is posted on the "Investor Relations" section of our website, which is located at https://ir.gitlab.com under "Documents & Charters" in the "Governance" section of our website. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our Code of Business Conduct and Ethics by posting such information on our website at the address and location specified above.

180.    Regarding the "Board of Directors' Role in Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

> Our board of directors, as a whole, has responsibility for risk oversight, although the committees of our board of directors oversee and review risk areas that are particularly relevant to them. The risk oversight responsibility of our board of directors and its committees is supported by our management

reporting processes, which are designed to provide visibility to our board of directors and to our personnel that are responsible for risk assessment and information about the identification, assessment and management of critical risks and management's risk mitigation strategies. These areas of focus include competitive, economic, operational, financial (accounting, credit, investment, liquidity and tax), legal, regulatory, cybersecurity, privacy, compliance and reputational risks. Our board of directors reviews strategic and operational risk in the context of discussions, question and answer sessions, and reports from the management team at each regular board meeting, receives reports on all significant committee activities at each regular board meeting, and evaluates the risks inherent in significant transactions. Our audit committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management.

Each committee of our board of directors meets with key management personnel and representatives of outside advisors to oversee risks associated with their respective principal areas of focus. Our audit committee reviews our major financial risk exposures, our internal control over financial reporting, our disclosure controls and procedures, legal and regulatory compliance, and, among other things, discusses with management and our independent auditor guidelines and policies with respect to risk assessment and risk management. Our audit committee also reviews matters relating to cybersecurity and data privacy and security and reports to our board of directors regarding such matters. Our compensation and leadership development committee evaluates our major compensation related risk exposures and the steps management has taken to monitor or mitigate such exposures. Our nominating and corporate governance committee assesses risks relating to our corporate governance practices, the independence of our board of directors and reviews and discusses the narrative disclosure regarding our board of directors' leadership structure and role in risk oversight. We believe this division of responsibilities is an effective approach for addressing the risks we face and that our board leadership structure supports this approach.

181. Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's AI capabilities did not reach much of what was advertised; (2) upon announcement, the AI feature were not made as widely available as advertised; (3) the Company's demand for AI integration was lower than expressed due to

security and data privacy concerns; (4) the Company's customer feedback on its AI capabilities was largely negative; (5) AI integration into the Company's platform was not viewed as adding value; (6) the Company was experiencing slowed net seat expansion due to the increase in the Premium tier price; and (7) as a result of all of this, the Company experienced a decline in expansion growth in its Premium tier, which led to a reduction in the Company's revenue guidance for the 2025 Fiscal Year. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

182.    The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

183.    Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Bedi and Bostrom to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year; (3) approve executive compensation on an advisory basis; and (4) approve an amendment to the Company's Certificate of Incorporation to limit the liability of certain officers as permitted pursuant to the Delaware General Corporation Law.

## **The Truth Emerges**

184.   On June 3, 2024, after the market closed, the Company issued the Q1 2025 Earnings Release, announcing its financial reports for the first quarter of the 2025 Fiscal Year.

185.   The Q1 2025 Earnings Release revealed the results of the Company's SSP analysis, which included an estimated $4 million headwind to the 2025 Fiscal Year guidance as compared to the guidance revealed in the FY 2024 Earnings Release.

186.   The Q1 2025 Earnings Release also announced the Company's ARR and DBNRR results for the first quarter, which disappointingly came in below the guidance. The Company's ARR increased only 21% year-over-year, 5 points below the consensus growth expectations. Meanwhile, the DBNRR fell by 1% to 129%.

187.   On this news, the price of the Company's stock fell $2.32 per share, or approximately 4.9%, from a close of $47.07 per share on June 3, 2024, to close at $44.75 per share on June 4, 2024.

## SUBSEQUENT DEVELOPMENTS

188.   On June 25, 2024, the Company issued a press release called "GitLab Survey Reveals Tension Around AI, Security, and Developer Productivity within Organizations." The press release revealed that in April 2024, the Company had surveyed over 5,300 chief experience officers, IT leaders, developers, and security professionals to get feedback on implementing DevSecOps. According to the survey, 69% of respondents stated they were shipping software at least twice as fast as a year prior, however only 26% of respondents claimed they were implementing AI. The survey also showed that 56% of chief experience officers felt introducing AI into software development is risky, and 40% of individual contributors claimed they were concerned about privacy and data security as a hurdle to utilizing AI in software development.

189.   On July 1, 2024, the Company began to offer a "SMB Premium Tier" for $19 per user per month, basically offering a subscription that was identical to the Premium tier before the price increase.

190.  On September 10, 2024, Defendant Robins represented the Company during a presentation at the Piper Sandler Growth Frontiers Conference. In response to a question about the impact of the price increase of the Premium tier, Defendant Robins admitted that the Company had "actually seen a little price sensitivity [] in SMB and mid-market," which resulted in lower Base Customers added.

191.  On December 5, 2024, the Company announced that Defendant Sijbrandij would be stepping down as CEO of the Company, although remaining on as Chairman of the Board, and William Staples would become the next CEO of GitLab.

## DAMAGES TO GITLAB

192.  As a direct and proximate result of the Individual Defendants' conduct, GitLab has lost and will continue to lose and expend many millions of dollars.

193.  Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

194.  Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

195.  Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

196.  Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

197.  As a direct and proximate result of the Individual Defendants' conduct,

GitLab has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

198.    Plaintiff brings this action derivatively and for the benefit of GitLab to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of GitLab, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Sijbrandij, Robins, and DeSanto.

199.    GitLab is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

200.    Plaintiff is, and has been at all relevant times, a shareholder of GitLab. Plaintiff will adequately and fairly represent the interests of GitLab in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

201.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

202.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, GitLab's Board consisted of the following eight individuals: Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan (the "Director-Defendants") and non-party William Staples (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was filed.

203.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of

the schemes they engaged in knowingly or recklessly engage in and/or cause the Company to make false and misleading statements and omissions of material fact. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

204.    Moreover, all of the Director-Defendants solicited the false and misleading 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Bedi and Bostrom the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company.

205.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted GitLab to issue materially false and misleading statements. Specifically, the Director-Defendants caused GitLab to issue false and misleading statements which were intended to make GitLab appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

206.    Additional reasons that demand on Defendant Sijbrandij is futile follow. Defendant Sijbrandij co-founded the Company in 2011 and served as its CEO from September 2014 until December 2024. He has also served as the Chairman of the Company's Board since September 2014. In addition, Defendant Sijbrandij is the controlling shareholder of the Company. The Company provides Defendant Sijbrandij with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Defendant Sijbrandij also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bedi and Bostrom to the Board for a three-year term,

thereby allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer during the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein, and personally made many of the false and misleading statements himself. Moreover, Defendant Sijbrandij's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. Moreover, Defendant Sijbrandij is named as a defendant in the Securities Class Action. For these reasons, Defendant Sijbrandij breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

207.    Additional reasons that demand on Defendant Bedi is futile follow. Defendant Bedi has served as a Company director since April 2019. He also serves as a member of the Audit Committee. Defendant Bedi has received and continues to receive handsome compensation for his role as a director. Defendant Bedi also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendant Bostrom and himself to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Bedi's insider sale made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons too, Defendant Bedi breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

208.  Additional reasons that demand on Defendant Blasing is futile follow. Defendant Blasing has served as a Company director since August 2019. She also serves as the Chair of the Audit Committee. Defendant Blasing has received and continues to receive handsome compensation for her role as a director. Defendant Blasing also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bedi and Bostrom to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Blasing breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

209.  Additional reasons that demand on Defendant Bostrom is futile follow. Defendant Bostrom has served as a Company director since April 2019. She also serves as the Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. Defendant Bostrom has received and continues to receive handsome compensation for her role as a director. Defendant Bostrom also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendant Bedi and herself to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously

disregarded her duties to protect corporate assets. Moreover, Defendant Bostrom's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate her motive to participate in the scheme. For these reasons too, Defendant Bostrom breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

210. Additional reasons that demand on Defendant Jacobson is futile follow. Defendant Jacobson has served as a Company director since April 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Jacobson has received and continues to receive handsome compensation for his role as a director. Defendant Jacobson also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bedi and Bostrom to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Jacobson's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons too, Defendant Jacobson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

211. Additional reasons that demand on Defendant Saintil is futile follow. Defendant Saintil has served as a Company director since November 2020. She also serves as a member of the Compensation Committee. Defendant Saintil has received and continues to receive handsome compensation for her role as a director. Defendant Saintil

also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bedi and Bostrom to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Saintil breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

212. Additional reasons that demand on Defendant Sullivan is futile follow. Defendant Sullivan has served as a Company director since January 2020 and as the Lead Independent Director since March 2021. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Sullivan has received and continues to receive handsome compensation for his role as a director. Defendant Lundgren also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bedi and Bostrom to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Sullivan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

213. Additional reasons that demand on the Board is futile follow.

214. Defendants Blasing (as Chair), Bedi, and Sullivan (collectively, the "Audit

Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

215.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

216.   GitLab has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for GitLab any part of the damages GitLab suffered and will continue

to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

217.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

218.    The acts complained of herein constitute violations of fiduciary duties owed by GitLab's controlling shareholder, officers, and directors, and these acts are incapable of ratification.

219.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of GitLab. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of GitLab, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

220.  If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause GitLab to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

221.  Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

222.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

224.  Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

225.  Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan caused the 2024 Proxy Statement to be false and misleading by failing to disclose,

*inter alia*, that: (1) the Company's AI capabilities did not reach much of what was advertised; (2) upon announcement, the AI feature were not made as widely available as advertised; (3) the Company's demand for AI integration was lower than expressed due to security and data privacy concerns; (4) the Company's customer feedback on its AI capabilities was largely negative; (5) AI integration into the Company's platform was not viewed as adding value; (6) the Company was experiencing slowed net seat expansion due to the increase in the Premium tier price; and (7) as a result of all of this, the Company experienced a decline in expansion growth in its Premium tier, which led to a reduction in the Company's revenue guidance for the 2025 Fiscal Year. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

226. Under the direction and watch of Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

227. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

228. As a result of Defendants Sijbrandij, Bedi, Blasing, Bostrom, Jacobson, Saintil, and Sullivan causing the 2024 Proxy Statement to be false and misleading,

Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Bedi and Bostrom to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2025 Fiscal Year; (3) approve executive compensation on an advisory basis; and (4) approve an amendment to the Company's Certificate of Incorporation to limit the liability of certain officers as permitted pursuant to the Delaware General Corporation Law.

229.    The Company was damaged as a result of Defendants Sijbrandij's, Bedi's, Blasing's, Bostrom's, Jacobson's, Saintil's, and Sullivan's material misrepresentations and omissions in the 2024 Proxy Statement.

230.    Plaintiff, on behalf of GitLab, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

231.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GitLab's business and affairs.

233.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

234.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GitLab.

235.    In breach of their fiduciary duties owed to GitLab, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's AI capabilities did not reach much of what was advertised; (2) upon

announcement, the AI feature were not made as widely available as advertised; (3) the Company's demand for AI integration was lower than expressed due to security and data privacy concerns; (4) the Company's customer feedback on its AI capabilities was largely negative; (5) AI integration into the Company's platform was not viewed as adding value; (6) the Company was experiencing slowed net seat expansion due to the increase in the Premium tier price; and (7) as a result of all of this, the Company experienced a decline in expansion growth in its Premium tier, which led to a reduction in the Company's revenue guidance for the 2025 Fiscal Year. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

236.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

237.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

238.   In yet further breach of their fiduciary duties, during the Relevant Period, while shares of the Company's common stock were at artificially inflated prices before the fraud was exposed, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $223.4 million.

239.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the

purpose and effect of artificially inflating the price of GitLab's securities.

240.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of GitLab's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

241.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

242.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GitLab has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

243.   Plaintiff, on behalf of GitLab, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

244.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GitLab.

246.   The Individual Defendants either benefitted financially from the improper

conduct, or received bonuses, stock options, or similar compensation from GitLab that was tied to the performance or artificially inflated valuation of GitLab, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

247. Plaintiff, as a shareholder and a representative of GitLab, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

248. Plaintiff, on behalf of GitLab, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

249. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence GitLab, for which they are legally responsible.

251. As a direct and proximate result of the Individual Defendants' abuse of control, GitLab has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252. Plaintiff, on behalf of GitLab, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

253. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254. By their actions alleged herein, the Individual Defendants, either directly or

through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of GitLab in a manner consistent with the operations of a publicly held corporation.

255.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, GitLab has sustained and will continue to sustain significant damages.

256.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

257.    Plaintiff, on behalf of GitLab, has no adequate remedy at law.

### SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

258.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

260.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused GitLab to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

261.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

262.    Plaintiff, on behalf of GitLab, has no adequate remedy at law.

### SEVENTH CLAIM
### Against Defendants Sijbrandij, Robins, and DeSanto for Contribution Under
### Sections 10(b) and 21D of the Exchange Act

263.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

264.   GitLab and Defendants Sijbrandij, Robins, and DeSanto are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Sijbrandij's, Defendant Robins's, and Defendant DeSanto's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

265.   Defendants Sijbrandij, Robins, and DeSanto, because of their positions of control and authority as controlling shareholder, officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

266.   Accordingly, Defendants Sijbrandij, Robins, and DeSanto are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

267.   As such, GitLab is entitled to receive all appropriate contribution or indemnification from Defendants Sijbrandij, Robins, and DeSanto.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of GitLab, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided

and abetted the breach of their fiduciary duties to GitLab;

(c)    Determining and awarding to GitLab the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing GitLab and the Individual Defendants to take all necessary actions to reform and improve GitLab's corporate governance and internal procedures to comply with applicable laws and to protect GitLab and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of GitLab to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding GitLab restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 14, 2025          Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/  Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Eduardo Preciado, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of February, 2025.

DocuSigned by:

*Eduardo Preciado*

A541D2E5EDEA4B9...

Eduardo Preciado